GEORGE F. ROBERTSON PLASTERING COMPANY, a Corporation, Plaintiff-Respondent,

v.

Phil MAGIDSON and Oakland Realty Company, a Corporation, Defendants-Appellants.

No. 43775.

Supreme Court of Missouri.

Division No. 1.

Sept. 13, 1954.

Motion for Rehearing or to Transfer to Court en Banc Denied Oct. 11, 1954.

Max Sigoloff, St. Louis, for appellants.

Susman, Mayer & Willer, Oliver F. Erbs, St. Louis, for respondent.

HYDE, Presiding Judge.

This is an equitable mechanics lien suit in which plaintiff seeks a lien for $10,003.-20, the amount claimed to be due for lath and plaster work on an apartment building in St. Louis. The trial court entered judgment for plaintiff for this amount and defendants have appealed.

Defendant, Oakland Realty Company, was the owner of the property and defendant Magidson was the general contractor. He also had an interest in the Realty Company and will hereinafter be referred to as defendant. On November 4, 1947, the following proposal was made by plaintiff and accepted by defendant: "We propose to furnish labor and material for the lathing and plastering according to plans and specifications on the above mentioned building for the sum of $24,867.00. The above price is the guaranteed contract. Work to be done on cost plus 10% Overhead and 10% Profit. Any saving shall be deducted from above contract." Plaintiff contends that after the work commenced, in December 1947, this contract was abandoned by agreement of the parties and it was agreed that the lath and plaster work should be done on a time and material basis, that is on the cost plus basis stated in the contract.

Thus the principal issue for determination is whether plaintiff is limited to the contract price or can recover the full amount he claims, for labor and material used, on the cost plus basis. On this issue, the trial court found in its decree: "This proposal, the Court finds, was abandoned by the parties thereto and the plaintiff furnished and installed its materials, both lathing and plastering, and furnished the labor to install same, on a quantum meruit basis." The court entered judgment on this basis for the full amount claimed.

Defendant contends this finding is not supported by substantial evidence, that this Court should find to the contrary and that this finding was outside the issues made by the pleadings. As to this latter contention, defendant says abandonment of the contract was not pleaded by plaintiff either in its petition nor in its reply. However, plaintiff's petition was on quantum meruit and the contract was set up in defendant's answer as a defense. A reply to an answer is not now a required pleading unless ordered by the court. (Sections 509.010 and 509.400, statutory references are to RSMo and V.A.M.S.) Furthermore, the issue of whether the original contract applied or whether there was an abandonment of it was fully tried by the parties. See Pleiman v. Belew, 360 Mo. 219, 227 S.W.2d 733. We hold that this issue was properly before the trial court for its decision.

Plaintiff's evidence was that the plans for the building provided for masonry partition walls, gypsum, concrete block or tile. Defendant wanted to figure on changing these partitions to two inch solid metal lath and plaster. Plaintiff's president, George F. Robertson, said defendant came to his office with two sheets of floor plans. He made the

written proposal of November 4, 1947 on the basis of what those plans showed but said that when the work started he found that the plans actually used for the building were different from those from which he figured the proposal for lathing and plastering. He said he never again saw the plans from which he figured the contract price. (Defendant denied he showed Robertson any different plans.) The first lath work was begun December 8, 1947. Plaintiff had an agreement with the George Stroup Lathing Company to do the lathing at an agreed price. Robertson said that three or four days after the lathers started Jack Stroup called him to come out and he met there with defendant and George and Jack Stroup. He said the Stroups found that the concrete columns were out of plumb and the beams in the corridors out of level which required them to build false work around them with metal lath, called furring, to make it look the same across the whole wall of the apartment; that partitions had been laid out on the floors differently from the way they were required to build them; that access panels (for deliveries into apartments) had to be set in the metal partitions; that steel door frames (called door bucks) had to be turned around and reset (because of radiators and other obstructions which made it necessary to have the door swing the other way); and that this later required them to take down lath and re-lath around them. Robertson testified that, in the presence of defendant, George Stroup said: "We cannot do that kind of work, when we figured two-inch solid partitions throughout this job, at that cost." Robertson then said he told defendant: "This work is going to cause a lot of labor, and we are just at the start of the job, and if we are going to keep time on each individual change, why, it is going to have you have a foreman here at all times to sign the different orders"; and that defendant then said: "George, you have been doing my work for the last two years. You are fair, you are the fairest man I ever dealt with. You go ahead and do the job on a time and material basis." He was corroborated by the two Stroups that defendant said to do the work on a time and material basis and there were also other plaintiff's witnesses who testified to later statements by defendant that plaintiff was doing the work on that basis. Robertson said that, after this agreement, he told the lathers to go ahead and do everything defendant told them to do. Plaintiff's evidence was that they even set the access panels and changed the door bucks themselves without waiting for defendant's carpenters to do it. George Stroup said: "Well, we figured we were working now on a time and material basis; it didn't make any difference what we done, whether we helped his carpenters or his carpenters helped us. We worked together on the job. We had no dissension with anyone." Plaintiff's evidence also showed that defendant later changed the plastering specifications as to ceilings and to use plaster instead of tile in the bathrooms.

As to the conditions encountered, Jack Stroup said: "We try to build our work plumb so it can receive a normal coat of plaster. Well, I walked into the building and as I was walking through the building I paid particular attention to the work that affects our work. They had steel columns in there laying as much as four inches out of plumb. That is no exaggeration at all; it is the truth. And then the other trades, especially the electrician, he wasn't coordinated to do our work, and I protested about it, because he couldn't keep out of the way of the lathers. * * * The carpenter proceeded to set the door bucks out there and he had a lot of bucks swinging the wrong way. He had even some of the doors swinging into the closet instead of on the outside of it. It necessitated our tearing the lath off and turning around the bucks, making them more secure so the plasterer could plaster them." George Stroup said: "We found that due to the change in construction that we couldn't lay out the work according to the drawings. It was a physical impossibility. * * * Where the other mechanical trades would rough in their work, according to the dimensions, our work would not fit it, and we would have to move partitions, oh, an inch or two inches or three inches, a varied amount. * * * We ran into several obstacles where we had

to change our partitions, and not being able to make the layout. * * * We found out we couldn't work according to the measurements, put the partitions where they had to be." Plaintiff's evidence also showed that they were required to build double partitions, to conceal pipes and plumbing stacks in the bathrooms and kitchens, which were not required under the original plans.

Plaintiff's evidence further showed that it sent defendant detailed statements each month showing the material used and the work done. The work was stopped by a city wide strike of lathers and plasterers during January and February 1948 but was resumed March 1st. Each month thereafter, defendant received statements (copies of which are filed here) showing the names of the men on the job, with the number of hours they worked each day and every item of material used and who furnished it. These monthly statements also show the amount due for the month, the total amount due including previous months' bills, the payments made and the balance due at the end of each month. By the end of June, this total had reached $31,397.70 ($6,530.70 more than the original contract price) but defendant thereafter made two payments of $2,000 each, one in July and one in September. Defendant made no objection to the amount of any of these bills or to the total amount being more than the original contract price until late in December 1948. The last work was done by plaintiff October 6, 1948. The date of the last bill sent to defendant was November 6, 1948. The total amount of the payments made by defendant was $23,000, his last payment being made September 7, 1948.

Defendant's evidence was that the plans he showed plaintiff, and from which plaintiff made his estimates for his proposal which became the original written contract, were the same plans that were used for the building. Defendant denied any subsequent agreement to abandon or modify the written contract. Two of defendant's carpenters testified that they laid out the lines for the metal lath partitions as called for on the plans they used and saw no changes of partitions. They said they changed the door

bucks that had to be changed and there were only about four of them. They also denied that the lathers installed the delivery service doors or that the furring of columns was required by defective construction, but said it was a necessary part of the work to be done by the lathers. Defendant also had evidence of defective plastering on which counterclaims were based. Defendant said he did not keep the statements sent him by plaintiff because he was only interested in what might be returned to him, by deduction from the contract price, if the work cost less than the maximum amount stated in the contract.

▪ Defendant contends that the testimony as to the December 1947 conference and conversation between him, Robertson, and the Stroups, was inadmissible as attempting to change the terms of a written contract; that plaintiff could not recover in quantum meruit in excess of the amount fixed by the contract; that nothing could be recovered for additional work in connection with the contract because no record was kept as to the amount of such extra work; that such work was only incidental to the work required to be performed under the contract; and that plaintiff was bound by the contract and could not recover more than the contract price on any theory. However, defendant's contentions do not meet the theory upon which plaintiff proceeded and upon which the court based its decree of an abandonment of the original contract by subsequent agreement and understanding that the work would be done on another and different basis. Plaintiff does not claim the original contract was not made or that its meaning was any different than defendant claims. What plaintiff claims is, that the original contract was abrogated by subsequent agreement and was replaced by the new subsequent agreement. The parol evidence rule forbids the admission of parol evidence of prior or contemporaneous agreements to alter, vary or contradict a written contract but it does not prohibit parol evidence of an agreement, entered into subsequent to the time when the written contract was executed, to alter or abrogate the written contract

32 C.J.S., Evidence, § 1004, p. 1008; 17 C.J.S., Contracts, § 377, p. 865; 20 Am. Jur. 1016; 12 Am.Jur. 1006, Sec. 428; Baerveldt & Honig Const. Co. v. Dye Candy Co., 357 Mo. 1072, 212 S.W.2d 65; Kennedy v. Bowling, 319 Mo. 401, 4 S.W.2d 438; Tighe v. Locke, Mo.App., 299 S.W. 105. We must, therefore, hold that this evidence was admissible; and that it was substantial evidence that the original written contract was abandoned and the work done under a different agreement then made.

■ Our review in equity cases and under Section 510.310 requires us to determine whether the judgment is clearly erroneous, that is whether or not the evidence considered as a whole is overwhelmingly against the findings of the trial court. " 'The question for our determination is therefore not merely one of whether the court's finding was supported by substantial evidence. On the contrary, it is our duty to make our own independent finding of the facts and reach our own conclusion as to where the weight of the evidence lies. Whatever findings the lower court may have made are in no sense binding upon us, although in matters where the evidence is conflicting and close we shall have due regard for the lower court's opportunity to judge the credibility of the witnesses.' " Faire v. Burke, Mo.Sup., 252 S.W.2d 289, 290; Cross v. Gimlin, Mo.Sup., 256 S.W. 2d 812. In this case, the findings of the trial court depend mainly upon the weight, credibility and value of the oral testimony of the witnesses who have personally appeared before the trial judge. We have carefully considered all the evidence (about 750 pages) and our conclusion is that it is ample to sustain his finding as to the abandonment of the original written contract by the subsequent agreement which Robertson and the Stroups testified was made. There was corroboration of their testimony both by other witnesses, who testified that thereafter defendant said the work was being done on the basis established by this subsequent agreement, and by many circumstances such as the lateness of defendant's complaint about the amount of the charges, the receipt by de-

fendant each month of detailed itemized statements for the work done and materials purchased and the payments made by defendant without protest or condition after he had been billed for amounts in excess of the original contract price. We must, therefore, uphold these findings and hold they were a proper basis for the court's decree establishing plaintiff's claim and lien.

■■ We must also reject defendant's contention that plaintiff failed to prove that the work and materials itemized in its petition actually went into the building. Plaintiff's bookkeeper testified that weekly time reports of the work done on the job were brought or phoned to him by the foremen and were posted by him on the records offered in evidence. He was also at the building several times and saw the men named in his records working there. Likewise, dray tickets for materials delivered to the building were brought to him and he posted them. All of the materials were brought from one company, except some taken from plaintiff's warehouse, and he had their statements to check with the dray tickets. The memoranda of the time worked and the dray tickets were not kept after being posted on plaintiff's books; and defendant argues that the account must be proved by them and not by the records made from them. These records were certainly admissible under the Uniform Business Records Act, Sections 490.660–490.690, and the testimony fully complies with the tests of Section 490.680. We hold they were properly admitted. It is conceded that plaintiff's men were working there and completed the job; and that plaintiff had to use the kind of materials shown to have been delivered. Plaintiff's records showed the labor and material was on defendant's apartment building; and its president, who supervised the job, identified the work and materials listed as done on and used in this building. Moreover, defendant, who was there almost every day, was sent complete copies of plaintiff's records every month, showing the work done and who did it, and the materials used and who furnished them. Defendant never at any time questioned

these statements or any item in them and still does not claim that any specific item is incorrect. Plaintiff used these work records for its social security and other taxes. The cases cited by defendant involve very different factual situations. Most of them, such as Davidson v. Fisher, Mo.App., 258 S.W.2d 297; Hill-Behan Lumber Co. v. Flegle, Mo.App., 183 S.W.2d 862; Tallman Co. v. Villmer, Mo.App., 133 S.W.2d 1085; Mansfield Lumber Co. v. Johnson, Mo.App., 91 S.W.2d 239; and Sechrist v. Hufty Rock Asphalt Co., Mo.App., 63 S.W.2d 193, were cases where materialmen sought to establish liens on accounts for material furnished without a definite showing as to where the material was used. In some of them it was shown the material was not used in the building against which the lien was sought. Some of them involved several buildings without any showing as to the specific building on which the material was used. None of them were cases where the lien claimant did the work and placed the material in the building itself. None of them involved a situation where such complete records were kept of the daily work done and materials used on a specific building and where the defendant personally saw the daily progress of the work with such detailed copies of the records furnished to him. We, therefore, hold there was ample evidence to support the court's finding that plaintiff's statement was correct and that the work and materials itemized therein did go into defendant's building.

As to defendant's counterclaims, based on delay in completing the work and on defective plastering causing some of it to crack and fall off, the court found he was not entitled to a judgment; and the same finding was made as to the same counterclaims asserted by the Realty Company. We think the court's findings as to these counterclaims was warranted by the evidence. These were also issues depending mainly upon the weight, credibility and value of the testimony of witnesses who personally appeared before the trial judge. Some cracking of the plaster was due to failure to place expansion joints in the roof. Some of the damage in bathrooms may have been due to carelessness of tenants. We cannot say the trial court's findings on the issues involved in these counterclaims were clearly erroneous.

The judgment and decree is affirmed.

All concur.

## PER CURIAM.

The death of defendant Phil Magidson having been suggested and shown to have occurred after the final submission of this case in this Court, it is ordered that the judgment of this Court affirming the judgment of the Circuit Court herein be entered as of the date of such submission. Batson v. Peters, Mo.Sup., 89 S.W.2d 46, 52; Vitale v. Duerbeck, 338 Mo. 556, 92 S.W.2d 691, 697.