Meyer **SCHWARTZ**, doing business as Meyer Schwartz Plumbing Company, Plaintiff-Appellant,

v.

**SHELBY CONSTRUCTION COMPANY,** Inc., a corporation and New York Life Insurance Company, a corporation, Defendants-Appellants,

I. R. Goldberg Plumbing Supply Company, a corporation, Independent Plumbing & Heating Supply Company, a corporation, Fidelity and Deposit Company of Maryland, a corporation, and Dorothy E. Gildehaus, Administratrix of the Estate of M. F. Gildehaus, deceased, formerly doing business as M. F. Gildehaus Plumbing & Heating Company, Defendants-Respondents.

No. 47854.

Supreme Court of Missouri,

Division No. 2.

Sept. 12, 1960.

Motion for Rehearing or to Transfer to Court en Banc Denied Oct. 10, 1960.

Shifrin, Treiman, Agatstein & Schermer, St. Louis, for Meyer Schwartz.

R. H. McRoberts, St. Louis, A. H. Kerth, Clayton, for Shelby Const. Co., Inc., and New York Life Ins. Co., Bryan, Cave, McPheeters & McRoberts, St. Louis, Kerth, Thies & Schreiber, Clayton, of counsel.

Samuel H. Liberman, Lewis, Rice, Tucker, Allen & Chubb, St. Louis, for I. R. Goldberg Plumbing Supply Co.

Oliver F. Erbs, Clayton, for Independent Plumbing & Heating Supply Co.

Herbert E. Barnard, Barnard & Timm, St. Louis, for Fidelity Deposit Co. of Maryland.

J. J. Brinkman, Richard M. Stout, St. Louis, for Gildehaus.

EAGER, Judge.

This action is an equitable mechanic's lien suit instituted initially by a subcontractor against the general contractor, the record owners, the holder of deeds of trust, other lien claimants, and certain unnecessary parties who were later dropped. Plaintiff sought recovery in quantum meruit of $205,274.18, with interest from May 9, 1951, against the general contractor Shelby Construction Company, Inc., a Louisiana corporation, and a lien against the real estate. A second count in tort was dismissed. Independent Plumbing and Heating Supply Company and M. F. Gildehaus were joined as lien claimants; they filed answers and cross bills seeking judgments against plaintiff and adjudications of their liens. On motion of Shelby, I. R. Goldberg Plumbing Supply Company, a Missouri corporation, and Fidelity and Deposit Company of Maryland, a corporation, were added as parties defendant. We shall often refer to these various parties, individual and corporate, by means of obvious abbreviations. Shelby filed a counterclaim against plaintiff and a cross-claim against Goldberg for damages aggregating $1,779,050.48, for breach of contract. Fidelity had executed a performance bond for plaintiff (and Goldberg) and Shelby cross-claimed against it for $810,-000 on the bond. No point is made here on the pleadings, as such, and we shall not review them.

In early 1949 Shelby became interested in constructing a large apartment project in St. Louis County as an FHA project. It opened temporary offices in St. Louis and began negotiations with the FHA (Federal Housing Authority), and employed architects, draftsmen and others. It submitted various tentative plans and, when FHA approval became certain, it purchased in its own name the substantial tract of land in question, taking title on January 30, 1950. Somewhat out of order we note here the following: On March 17, 1950, Shelby filed a plat of the subdivision; the development was known as Audubon Park Apartments, and it consisted of 1,392 apartment units in 219 separate buildings; the property is located in the City of Brentwood. On March 22, 1950, articles of incorporation were filed for four so-called "Bird Corporations," designated, respectively, as Bluebird Homes, Inc., Canary Homes, Inc., Cardinal Homes, Inc., and Peacock Homes, Inc. Certificates of authority to do business were issued to each of these corporations on March 29, 1950. The Shelby Corporation owned (as of all material dates) all capital stock of these corporations except for 100 shares of Class A preferred of each corporation, par value, $1 per share, which was issued to the FHA, apparently as a requirement of the loan agreement or the appropriate regulations. The incorporators and officers of each corporation were officers of Shelby. On March 30, 1950, Shelby conveyed to each of these four corporations a separate portion of the land involved. On April 5, 1950, each of these corporations executed notes and a deed of trust, the respective amounts varying from $2,473,000 to $3,667,400, and aggregating $11,163,200; these were all assigned to defendant New York Life Insurance Company at varying dates in 1951. On April 5, 1950, each of these corporations entered into a contract with Shelby as general contractor for the construction of the housing units, as per certain plans and specifications.

On or about March 22, 1950, Shelby furnished to Meyer Schwartz, a relatively small plumbing contractor of St. Louis, a set of plumbing plans for the project. These are often referred to by plaintiff as the "bid plans"; essentially they showed in a general way the things to be accomplished, such as the location of fixtures, but not the detailed installations, measurements, etc.; they have been referred to as "diagrammatic" plans. These plans omitted many features shown in the later and complete plans. At approximately the same time plans were submitted to various other plumbing contractors. Plaintiff had been brought into the picture by Frederick Goldberg of St. Louis, President of two de-

fendant corporations, who had first contacted Mr. Kapelow, President of Shelby, in an effort to sell plumbing material for the project. Plaintiff submitted a bid of $830,000 in April 1950, based on these "bid plans" and sundry interviews with the Shelby people. Hearing nothing further, he became somewhat disgusted and turned in his plans. Negotiations were resumed a little later, and these resulted in the controverted subcontract of May 16, 1950, between Shelby and plaintiff for all plumbing work on the project at a total price of $810,000. This was the largest single subcontract on the job. However, Shelby, doubtful of plaintiff's financial responsibility, insisted that the Goldberg Company execute the contract with plaintiff; this it did in effect, but by means of a separate contract in which it "completely undertook" the obligations of Schwartz in his contract.

Paul Kapelow was President of Shelby; one Charlie Kornman was Vice-President; Lester Gross, a lawyer of St. Louis, acted as its counsel and, in fact, handled much of the administrative work on this job. No question of lack of authority on the part of any of these men has been raised. The completed plans for the FHA were assembled by April 11, 1950, and dated as of that date; the commitment of the FHA was made on April 18, 1950. During March, April and May many conferences were held between plaintiff and Goldberg on the one hand and the various officers of Shelby on the other, concerning the job, the specifications and many details of the plumbing work. The job was repeatedly represented as one for mass production and "prefabrication," with eight basic building units to be repeated over and over, and requiring speed in all phases. There is much argument here about the reasons for the failure of plaintiff to "prefabricate" his installations to a greater extent. "Prefabrication" refers to the method of assembling in advance, usually in a shop located right on the job, such pipes and fittings as are uniform in the various buildings and may be uniformly installed; this is generally done by designated men who become practiced in that process. The subsequent installation of such an assembly in its designated place in any building is supposedly hastened, and it seems to be agreed that this process, when permissible, saves labor, time and money.

Plaintiff's suit here is in quantum meruit, as already stated. Shelby seeks to hold him strictly to the contract insisting that he and Goldberg breached it, and it asks very substantial damages. As damages Shelby claims: the entire amount paid another plumbing contractor for completing the job; the cost of carpenter work supposedly performed on plaintiff's behalf; and sundry consequential damages which it insists were caused by plaintiff's delays, including loss of rents, additional interest, overhead, increased and additional wages, etc. In answer to all this, plaintiff and Goldberg say that the contract was induced by fraudulent representations, and, moreover, that it was abandoned by mutual consent as evidenced by the acts of all parties. Much evidence was devoted to the oral negotiations. Plaintiff was not furnished at any time a set of the FHA (complete) plans. He asked for further plans; he and Goldberg testified that they were told that none were available, and also that they had seen the plans. Shelby denied all this, and insisted that the completed plans were available after April 18, and that, in fact, plaintiff and Goldberg examined parts of them from time to time and worked with Shelby on the plumbing specifications. In plaintiff's contract, by virtue of a typed rider prepared by Gross, he agreed to perform "as specified in the plans and specifications * * *" following which there appear references to numerous pages; these references are largely to pages of the separate plans of each of the four corporations. Plaintiff testified that he thought these were merely his "bid plans" elaborated to apply to each separate corporation. We have concluded that there was nothing which actually prevented plaintiff from examining the FHA plans, but that he was never furnished an assembled

set; that such would have shown vital elements missing from his "bid plans"; and that the completed plans were somewhat scattered in the general disarray of a large and complicated job. Shelby contends that the FHA plans are those referred to in the contract and that Goldberg helped to pick out the necessary pages for reference. Indeed, it claims that the bid plans, obviously incomplete, were only furnished to the plumbers so that Shelby could get approximate costs and then negotiate a subcontract. We note, however, that many plumbers actually submitted bids, but this point will not be decisive. The various sets of plans, with hundreds of other exhibits, twelve volumes of the transcript of evidence, and two volumes of pleadings and entries are on file here. Scant reference can be made to much of this material. Plaintiff and Goldberg insist that they were told very specifically that eight pilot building units would be constructed from which they could make complete measurements and prepare their own plans, and that the entire operation would be a simple installation repeated over and over. Shelby denies this strenuously and says that it never intended to build any sample units. Once the general construction was started it proceeded as fast as the performance of the different phases would possibly permit. Plaintiff had computed the amount of his bid by multiplying his estimated cost on each type of unit by the number of such units. In the cost allocations submitted by Shelby to the FHA, the total estimate for plumbing was $1,175,430; the effect and meaning of these are in serious dispute. Plaintiff, to Shelby's knowledge, had had no experience on any job comparable to this in size. At the time the contract was signed Shelby insisted that plaintiff include in his work the installation of furnace "transite," although plaintiff had not figured this in his bid; this work consisted of installing the composition flues or vents leading from the furnaces up through the roofs. This was not included in plaintiff's written contract, but it was included in the plumbing job orally, at a more or less arbitrary and haphazard figure. We consider this matter later.

At the date of plaintiff's contract Shelby had begun to pour foundations. These were supported by concrete piers, rather than by continuous footings. Much controversy rages around the matter of these piers. Plaintiff had probably seen, or could have seen, a few piers in place at the time of his contract. His "bid plans" showed a typical cross section containing three piers under a curtain wall. Plaintiff began his work at about the end of May; he first ran pipes in the streets for the water supply, but soon started his "rough-ins" within the building sites. In this first stage he laid heavy cast iron (soil) pipe from the outside sewer lateral to a designated point inside the foundation where the "stack" was to be. The stack (or stacks) afforded drainage of sewage and waste water from the building. He immediately encountered difficulties with the piers supporting the foundation walls; he found that these interfered with the laying or "run-out" of his soil pipe, in that his runs could not be made in a straight line, and that offsets were necessary, with more pipe, fittings and labor. Numerous conversations were had and complaints made about this; plaintiff testified, with some support, that the pier locations differed even on buildings of the same type, and that no uniform mode of procedure was possible. This was complicated by the fact that piers also supported porches. Shelby insisted, then and now, that plaintiff should have studied the complete foundation plans in the office, and that he could have avoided most of his difficulties by diagonal "run-outs" from the stacks. Another complication was that Shelby, which poured all concrete through its own employees, proceeded to pour foundation walls so rapidly (spurred by the onset of the Korean War and a possible shutting down of unstarted construction) that plaintiff was unable to catch up in his "rough-in" work, and thereby was totally unable to use a ditching machine inside the area of the buildings themselves. Generally, he found it necessary to have

his laborers dig by hand under the foundation walls, locate the piers, and then install his soil pipe. While a major portion of the briefs is devoted to arguments on this phase of the matter, pro and con, as causing or not causing the lack of prefabrication on "rough-ins" and a consequent delay in plaintiff's work, it will be impossible for us to consider it in any great detail. From the start plaintiff's operations seem to have been conceived and born in trouble.

Most of these buildings had no basements,—only a crawl space. Because of the rolling terrain, however, some did, usually at one end. A concrete slab was poured for the first floor after the ground "rough-in"; thereafter the carpenters "framed in" the building. Witnesses, even on Shelby's behalf, disagreed as to whether plaintiff should have extended his rough-in plumbing to the second floor level ahead of this framing operation. In any event, he never did so and the carpenters worked far in advance. They were direct employees of Shelby. Plaintiff continually found studs, joists, plates and all sorts of woodwork of the frames obstructing his installations. He complained often and long. He says that he could not consistently plan or engineer his work or prefabricate his materials because the exact dimensions and placing of the framing differed in the various buildings of the same type. The "stacks," water pipes and vents had to be installed inside the partition walls before they were closed in. The space was extremely restricted. Shelby says that plaintiff was required by his contract to "notch" the framing where necessary to permit the installation of the plumbing, and to pay for the time of carpenters if their services were required for more radical cutting and rebuilding. After a long period of interference and controversy Shelby began leaving out certain portions of the partition walls in the original installation, and assigned carpenters to the job of cutting and replacing rafters, joists, etc. to permit the installation. It now asks for $97,600 in the counterclaim for the services of carpenters.

Even those steps did not eliminate the difficulties or the controversies. There is no doubt that the framing presented many and continuous obstacles to plaintiff; whether these were substantially greater than those usually encountered is a source of much controversy. There was certainly a substantial lack of the wholehearted cooperation essential on such a project; we feel that this was due in part either to insufficient engineering on the framing work, or to a lack of cooperation on the part of the carpenter trade, or to both.

Many changes in plans were made as the project proceeded. In fact, a whole new set of plans (the "as built" plans) was prepared to show the project as actually completed. The changes will be discussed in some detail later. There is substantial evidence that in the summer or early fall of 1950, plaintiff and Goldberg began to tell Kapelow (who was the guiding genius and sole manager of the project) that the job they were required to do was wholly different from their contract. Kapelow, in substance, admits that there were such conversations. Some say these came later. Plaintiff and Goldberg stated that the job should be put on a time and material (or cost) basis, but Kapelow verbally and consistently refused. He stated that he could not let the job "run loose"; at various times plaintiff threatened to quit the job because of the added costs, the changes in the job, the interferences, and what he said was the impossibility of fixing the actual costs from day to day. On these occasions Kapelow, in substance, urged plaintiff to go on and told Goldberg that he must keep plaintiff on the job. During substantially the whole period of the work Kapelow complained of plaintiff's delays in production and of his failure to meet the contracted "peak production" schedule of 85 units per week. That, as the evidence indicated, was a somewhat ambiguous guide.

At the outset, Kapelow had set up a plan of payment whereby he paid weekly all of plaintiff's payrolls; and from time to time he paid his material bills in full, substanti-

ated as they were by detailed invoices and drayage tickets. This was done because Kapelow recognized plaintiff's obvious inability to finance such a project. By oral agreement payments of $150 per week were added to the payroll for plaintiff's own personal services and these payments continued throughout his presence on the job. Plaintiff started his operations with a few plumbers and laborers; the number increased until, at the maximum, he was employing 87 plumbers. Under his contract he operated with union men and, generally speaking, he took what he could get. Kapelow complained of these men loafing, taking coffee breaks, leaving early, etc. Markowitz, who succeeded plaintiff, admitted having trouble in getting good men and used many old men, but claimed that he improved the situation considerably by firing the loafers in substantial numbers. Plaintiff's superintendent and general foreman, men of considerable experience in the plumbing trade, testified that on the whole they got good work out of their men, and that the misfits were eliminated as quickly as possible. Everyone concerned agrees that plaintiff did "beautiful" work; the complaint is that it took too long, was "tailor made" for each building, and cost too much. Kapelow admitted that it was better work than he expected; perhaps it was better work than he wanted.

At some time soon after the first of 1951, it became obvious to all concerned that plaintiff could not complete his work within the contract price, even with allowance of such "extras" as Kapelow inferentially admitted. Plaintiff had performed certain work which clearly constituted extras, but for which no written orders had been issued, and no specific claims made. Controversies continued regarding the delays, responsibility for delays, and added costs. Plaintiff insisted that the job was a totally "different" one and that the ultimate cost could not be accurately determined. Shelby insisted that he submit specific costs. In March or April 1951, when Shelby had paid to plaintiff or his suppliers a total of

$813,522.06, it stopped further payments. The last payment for material was made on March 10, this being for material delivered prior to February 1. Meetings and negotiations ensued, arbitration was considered, and two further payroll payments were made under "non-prejudice" agreements, making a grand total of $845,039.46 paid to or for plaintiff. When it was obvious that an impasse had been reached, plaintiff withdrew entirely from the job, leaving uninstalled materials of the inventoried value of $112,166.81. These were largely used in finishing the work. Markowitz Bros. Plumbing Co., a large contractor of Miami, Florida (one of the original bidders), was employed by Shelby to complete the work, under a cost plus fixed fee contract. It was paid a total of $277,025.38, including the $32,000 fixed fee. Rough estimates were made by certain witnesses of the portion of the total work completed by plaintiff. These varied from 60% to 80%, apparently according to the varying perspectives. A fair figure might well be 70% or a little less, if that be material. The entire project was completed in the fall of 1951. In May 1952 Shelby sold the entire property by a sale of the capital stock of the four "Bird" Corporations, subject, of course, to the liens of the New York Life.

█ Plaintiff has insisted throughout the case that the contract was procured by fraudulent misrepresentations and is therefore void. Both the referee and the trial court found against that contention, as we do now. While we do not feel that Shelby dealt with plaintiff in a completely forthright manner in their negotiations, as indicated later, the parties were dealing at arm's length and the representations and omissions did not constitute fraud. We pass that point.

█ The vital question here is whether there was a legal abandonment of the contract. It is obvious that plaintiff may not recover in quantum meruit if he breached a valid and subsisting contract. This question is essentially one of fact; and plaintiff

is bound by his contract unless it was abandoned. An abandonment may be accomplished by express mutual consent or by implied consent through the actions of the parties. See the following cases: Baerveldt & Honig Construction Co. v. Dye Candy Co., 357 Mo. 1072, 212 S.W.2d 65; Wunderlich Contracting Co. v. United States of America ex rel. Reischel & Cottrell, 10 Cir., 240 F.2d 201; George F. Robertson Plastering Co. v. Magidson, Mo., 271 S.W.2d 538; Fuhler v. Gohman & Levine Construction Co., Mo., 142 S.W.2d 482; 17 C.J.S. Contracts § 388, p. 880. The law is not complicated, though the facts may be. While there are some factual distinctions in the cited cases, it is not necessary to discuss them here. The principles are well established. Plaintiff cannot be guilty of a breach of the contract if it has been mutually abandoned. In one case cited by defendant Shelby it is stated (Sauder v. Dittmar et al., 10 Cir., 118 F.2d 524, 530) that where acts and conduct are relied on to constitute an abandonment, they "must be positive, unequivocal and inconsistent with an intent to be further bound by the contract."

At the outset of our consideration of the facts we are met with the conflicting contentions that deference should and should not be given to the findings of the referee. He found that there was no abandonment of the contract, recommended the allowance to plaintiff of certain amounts as extras, and the allowance to Shelby of $353,237.98 on its cross-claim against plaintiff and Goldberg; and he found that the surety had been discharged by acts of Shelby which had prejudiced its interests.

We agree, generally, with the suggestion that where a trial court does not hear oral evidence, no deference is due to its findings from the standpoint of credibility. Berghorn v. Reorganized School District No. 8, 364 Mo. 121, 260 S.W.2d 573; Proffit v. Houseworth, 360 Mo. 947, 231 S.W.2d 612. The opportunity of a referee to hear witnesses and judge of their credibility may be a "factor" to be considered (Michler v. Krey Packing Co., Banc, 363 Mo. 707, 253 S.W.2d 136, 141.) Since the enactment of our present Civil Code, the report of a referee no longer stands as a special verdict, and the appellate court is required under § 510.310 RSMo 1949, V.A.M.S. to review the case "as in suits of an equitable nature." Baerveldt & Honig Construction Co. v. Dye Candy Co., 357 Mo. 1072, 212 S.W.2d 65. It is unnecessary to belabor the point here for we do not deem it to be in any way decisive. There are many important facts here which do not depend upon considerations of credibility.

We have concluded that the acts of the parties here resulted in a legal abandonment of the contract. We shall point out in some detail the considerations which lead us to that conclusion. First, we consider the changes, recognizing that a contract may be modified without abandonment. It is clear that changes were made here almost from day to day to the end of the project. While Shelby takes the position that most of these changes were merely in methods and not plans, Mr. Kapelow himself testified that "we changed the job almost up until the final day * * *," and that changes in plans were being made from the inception of the job to its completion. Material structural changes were made in the so-called "E" type buildings by substituted plans involving additional costs. There is little controversy that plaintiff's actual additional cost on that was $22,341.16. This was the only change on which a change order was actually issued as per contract while plaintiff was on the job. This change involved a complete relocation of the bathrooms in 160 units. The locations of fixtures were changed in the bathrooms of 502 units to promote the supposed convenience of the users, at variance with the completed plans. This, according to plaintiff, required more material and labor, including additional vents, and cost $22,000. Some question was raised by Shelby concerning the necessity of the additional vents. The sinks in No. 2 units were moved from an inside to an outside wall, requiring different and

additional drainage lines in 52 units at a minimum cost of $3,871.44. The locations of water heaters were changed in approximately 520 units. Drains were installed for the emergency relief valves of all water heaters to prevent possible flooding, for which no provision had been made; the cost was $12,026.94. Plaintiff was required, in all rooms except the kitchens, of nearly all units, to drill holes in the second floor joists for his copper water pipes, instead of suspending them from the bottoms of the joists as he had anticipated; there was no such requirement in the plans or specifications and one of Shelby's witnesses testified that this was an exceptional procedure. Kapelow was afraid of condensation from the pipes. This involved an additional cost of $12,600 in 200 buildings. In the plans it was provided that bathtubs in many adjoining units should be installed "back to back" against a partition wall. Obviously, this would save in plumbing labor and material. In the actual construction such tubs were reversed in order that an access panel might be provided in each unit for repair and emergencies. These changes, plus some additional reversals of tubs where the plans provided the installation on an outside wall, involved 666 units at an additional cost of at least $33,300. Shelby insists vigorously that these changes were not authorized or necessary and that they were made because plaintiff's union employees refused to install the tubs back to back. We find from the only independent evidence on the subject that neither the Building Code of the City of Brentwood nor the FHA regulations permitted the installation as planned, and that plaintiff was justified in making the change, if not actually required to do so. The change was recognized in the "as built" plans and by a change order filed after plaintiff quit. The "bid plans" did not show the elevations of the various units, but on account of the rolling ground there often were varying floor levels or elevations in the same building. These affected the plumbing work adversely, particularly where bathrooms in adjoining units were planned with a common plumb-

ing wall. Perhaps a full study of the FHA plans would have disclosed this feature in advance, but we note this development. Plaintiff's superintendent testified that even the plans furnished to him as he went along, a few buildings at a time, did not show the differing elevations, and plaintiff testified that he never had any plans which did so.

Aside from the foregoing, which were essentially major changes, there were many minor ones; the cumulative effect of these was substantial. They included: a change in 1,195 toilet seats at an added expense of $3.10 per seat; different and more expensive controls on all water heaters; different and more expensive high pressure "ball cocks" for all toilets; the use of unusual amounts of more expensive lead pipe as a substitute for cast iron soil pipe because of the restricted space in the partition walls and to avoid radical cutting of framing; this was done at the request of Shelby, and to satisfy the FHA; the installation of certain fixtures in basements; a change in the type of 1,177 bathtubs specified, at an additional cost; added freight on hot water heaters, incurred to procure immediate delivery from a more distant point; installation of nonfreeze outside hydrants; the procuring of certain amounts of "Victory" soil pipe, a heavier and more expensive material, at the onset of the Korean War, in order to have all material on hand immediately; moving certain roughed-in toilet installations from locations shown on the plans so that the bathroom doors would open. Most of these latter items were, by comparison, minor in amount, but the expense of the combined total was very substantial. Plaintiff claims that his additional costs, due to changes and extras, exceeded $200,000, when figured at a minimum. Generally speaking, the changes we have enumerated did not appear in the FHA plans, which Shelby claims were part of plaintiff's contract.

We find, also, that in certain respects there was a lack of cooperation on Shelby's part; in this we do not intend to say that plaintiff operated at 100% of efficiency.

This became especially material with reference to the much argued lack of prefabrication and mass production. Shelby's superintendent indicated in his testimony that plaintiff had done substantial amounts of prefabrication in certain phases. Probably no one but a panel of construction engineers acting as arbitrators could intelligently fix the entire blame in that controversy; but certainly a lack of cooperation may, under all the circumstances, be indicative of an intent to abandon or to acquiesce in the abandonment of the contract. Shelby admittedly rushed the installations of piers and foundations to a point where it was substantially impossible for plaintiff to catch up, and there were obvious disadvantages in any effort to jump ahead of the foundation work; and we do not find that Shelby, by advance layouts or engineering, substantially encouraged that, but rather left plaintiff "to his own devices." There is evidence that many pier locations were changed, complicating the rough-in problems; this may have been due to the terrain. We shall not consider in detail plaintiff's complaints about pier interference, for it is not decisive. He claims that substantially every foundation was different. We find that the framing construction of the buildings was sufficiently divergent and inconsistent to cause substantial interference with the plumbing installations, and to prevent uniform work. This, definitely, would tend to prevent mass production. Shelby furnished carpenters to cut and notch, it left out some studs, and still later it left out parts of partition walls, but there was a substantial element of interference with the plumbers' installations and certainly not a full cooperation, either in the conduct of the carpenters (who were Shelby's direct employees) or by means of specific and accurate measurements and plans. We think it highly material that plaintiff was never furnished a complete set of the FHA plans, which we find to be a fact, but was only given copies for specific buildings from time to time as he advanced. This is true regardless of any negligence on his part, and it evidenced a substantial lack of cooperation. It is improbable that he could get all the needed information by examining these plans from time to time in some official's office.

It is clear that plaintiff and Goldberg insisted after about two or three months of operation that the job they were doing was totally different from the contract job and that the project should be put on a time and material (or cost) basis. It is also clear that Kapelow, both orally and by written communications, reminded them that they had a contract, and refused to put the job on a different basis. But we may look through his words to his actions, if they constitute clear evidence of his real intent or of his acquiescence. For sometimes, according to the old expression, actions do "speak louder than words." We note briefly, as indicating acquiescence and an implied agreement, these things: that from the outset Shelby paid plaintiff's labor and material bills in full upon substantiated payrolls and invoices, with no pretense of following the requirements of architectural estimates of "work in place," or of the alternative mode provided in the contract, and with no deductions or limitations as per the contract; that although Shelby knew that plaintiff was not effecting completions at the contract rate (85 units per week at peak), it never exercised its option to terminate, but continued to make full payments until the amount slightly exceeded the basic contract price, and when it knew for a certainty that the job could not possibly be completed for the contract price; that while Shelby knew that plaintiff had employed Gildehaus to do a very substantial portion of the work on a cost plus basis, it paid his time and material promptly and in full as they accrued; and after plaintiff quit Shelby continued to pay Gildehaus on that basis. We note also that in various and sundry conversations Kapelow told plaintiff and Goldberg: that "I will take care of you * * *"; that "* * * you are getting your money and I will pay you a fair value for this job * * *"; that he knew the job was

running more than intended; that "no contractor ever lost money on my job and you won't lose any money on it." We find that these or similar conversations took place and that thereby Kapelow encouraged plaintiff to stay on the job, when he knew that both plaintiff and Goldberg were claiming that the job was wholly different and that the contract was not applicable; and that this is true despite Kapelow's words to the contrary. We note also that toward the end Kapelow offered on several occasions to pay plaintiff his entire cost, "less $65,000," but we do not rely on this, for it may well be considered as an offer of settlement.

As further indicating an intent to abandon on Shelby's part we note: that Kapelow suggested and more or less insisted on Sunday work at double time and held a meeting with plaintiff's plumbers; that various contract provisions were completely ignored, including the provisions of Shelby's General Contracts (incorporated into plaintiff's subcontract) requiring an architect who should inspect the work, certify and make valuations on all changes, have general supervision, impartially interpret the provisions of the contract, judge its performance, and decide all claims between the owner and contractor. The architect here was merely an employee of Shelby; he was consulted by Shelby only when it desired, and he acted at most in an advisory capacity. While defendants say here that all this is not shown to have prejudiced plaintiff, it is impossible to say truly that an impartial and effectively functioning architect might not have resolved many of the complaints and difficulties; and in any event this mode of operation showed an intent to disregard the contract, regardless of any specific prejudice. The provisions for change orders in the work, with fair valuations to be fixed, was wholly ignored except in one instance and in that (E Buildings) no valuation was fixed; in most instances plaintiff only knew of changes when he received revised plans. A payment of $150 per week was regu-

larly made to plaintiff for his own services, wholly outside the contract; the installation of furnace transite, to be discussed in some detail, was not even put in the contract or in the plumbing specifications; all material needed for the whole job was ordered onto the job site immediately at the onset of the Korean War; this was to be accomplished, if necessary, at an increased cost and this material was paid for by Shelby.

The following matters, while perhaps not specifically indicative of an intent to abandon, should be considered as parts of the circumstances explanatory of Shelby's acts: that in the contract negotiations plaintiff had been told that his bid of $830,000 was entirely too high; that through the explanation of a possible method of avoiding the Missouri Sales Tax plaintiff was induced to reduce his bid, though he later paid the tax; that no sample units were ever built for the purpose of measurements or plans; that the contract price was $810,000, including all transite, whereas the FHA requisition sheets fixed the total estimated cost of plumbing at $1,175,430, exclusive of furnace transite. (Shelby insists yet that this figure bore no relation to the anticipated cost, but the FHA Construction Examiner testified that it represented their own estimate of the cost of a plumbing subcontract on the job.) Also, all payments to plaintiff, whether covered by his contract or not, were lumped into and charged against him in one account; these included items such as a fire loss, damage to his installation by vandalism, and much extra work for which no contract modifications were attempted, although many of these things could not possibly have been included in his contract price. No differentiation whatever seems to have been made.

Last, but certainly not least, is the somewhat complicated matter of the "furnace transite." This, as already stated, involved the composition flues or pipes leading from the various gas furnaces in each and every unit out through the roofs. This work was not included in the plumbing specifications

and plaintiff had not figured on it, although apparently there was some casual discussion for a day or two before the signing of plaintiff's contract. At or about the closing time plaintiff objected that he had had no experience with transite, that under Union rules it had to be installed by steamfitters whom he did not and could not employ, and that he wanted no part of it. He was told by Kapelow (who admitted this) that if he wanted a contract he would handle this work. Plaintiff had figured a smaller installation of transite for water heaters which he planned on subcontracting on account of the Union rules. For all practical purposes Charlie Kornman, Kapelow's purchasing agent and general helper, arbitrarily fixed a price of $8,000, telling plaintiff that it was not worth any more. Plaintiff was able to raise this figure to $10,000 by winning the flip of a coin, and this amount was added to the tentative $800,000 figure, making a final contract price of $810,000. In this haphazard manner a job was imposed and a price was fixed on a very substantial and costly part of plaintiff's work. There was *nothing* on any plans to show how the transite should be installed. This is highly material. No provision of the written contract or of the plumbing specifications covered this work. Kornman pretended to make an estimate of the cost, but if it be considered as such he merely figured the approximate amount of material to be used in vertical lines extending through the roofs, and added some guess (and apparently a very poor guess) for labor. Plaintiff says that Shelby's representatives then and there agreed to subcontract this work for him; they deny it. When that part of the job was reached, plaintiff turned it over to Gildehaus on a cost plus basis, the installation being made by Union steamfitters. Gildehaus submitted his payrolls, plus small amounts paid by him for material, and Shelby paid them. The major material purchases were made by plaintiff and submitted along with his other material invoices. Plaintiff was never able to get a firm price from Gildehaus. The latter testified: that he was re-

quired by Shelby and the FHA to run the transite to the rear of the buildings so that the vents would not show, that 1,126 furnaces were moved toward the fronts of the buildings, that the size of the pipe was increased from four inches to six inches, that oval pipe was required to fit into the partitions, that there were so many obstructions in the framing of the buildings and so many offsets (with more pipe, fittings and labor) required that the work changed constantly from one building to another; that even at the end of the job the FHA ordered him to tear out and raise all the vents to a higher elevation above the roofs; that every building was "different"; that everything was oral and it seemed to him that the FHA operated the job. He could not recall a single building where the transite made a simple, straight run through the roof. Kapelow also complained of the steamfitters loafing on the job as he did of the plumbers. While plaintiff was on the job a total of $56,677.18 was paid for labor and material on the furnace transite. The total to the end of the job was approximately $98,000. For all practical purposes the furnace transite work was forced upon plaintiff by Shelby, —at a wholly unrealistic price, and although it was never included in the provisions of his written contract or in the plumbing specifications, the full cost of the work was charged to his account. This feature alone goes far toward constituting an abandonment of the written contract by way of a total disregard for it.

We have concluded that there was a legal abandonment of the contract, and that plaintiff was entitled to proceed in quantum meruit. This disposes of Shelby's counterclaim against plaintiff and Goldberg in its entirety, for there can be no breach of a contract after it has been mutually abandoned and rescinded. It also disposes of Shelby's claim against Fidelity and Deposit Company of Maryland, the surety. It remains for us to consider the amount to which plaintiff is entitled, the sufficiency of his lien, and the lien claims of

Independent and Gildehaus. There was abundant evidence to show that the material and labor furnished by plaintiff went into these buildings. Compare George F. Robertson Plastering Company v. Magidson, Mo., 271 S.W.2d 538, 542. No question is raised as to the time of filing the lien statement or the suit. The trial court awarded plaintiff judgment in the total sum of $91,374.58 as the reasonable value of material, labor, and his own personal services, the latter being computed at the rate of $150 per week; it also allowed interest at 6% from May 9, 1951, and adjudged a lien in his favor against the real estate for the then total sum of $135,386.39. The defendants have made no point here of the amount of that judgment as such (though contesting it in its entirety), and we shall not review that in the absence of proper briefs. Plaintiff claims error in the disallowance of its claim for $90,584 as compensation to plaintiff for the "reasonable value of his services," computed at 10% on all labor and material. Essentially, this was an attempted charge for supervision. The parties argue, pro and con, whether this constitutes "overhead and profit," and whether such an item can be recovered in quantum meruit. Much has been written on that general subject. See, Nelson v. Withrow, 14 Mo.App. 270; Rodgers v. Levy, Mo.App., 199 S.W.2d 79; Bradley Heating Co. v. Thomas M. Sayman Realty & Investment Co., Mo., 201 S.W. 864; Johnston v. Star Bucket Pump Co., 274 Mo. 414, 202 S.W. 1143; Fuhler v. Gohman & Levine Const. Co., Mo., 142 S.W.2d 482; George F. Robertson Plastering Co. v. Magidson, Mo., 271 S.W.2d 538. Although it seems that a claimant in quantum meruit is certainly not limited to a recovery of his costs, we need not discuss the authorities here. The Trial Court regarded this item as "overhead and profit" and disallowed it; we disallow it on the sole ground that the evidence does not sustain a recovery of that amount as the reasonable value of plaintiff's services, under all the circumstances of this case. There is no basis here for fixing a lesser amount (and in excess of $150 per week), nor do we find that plaintiff is entitled to more than the amount allowed for his services by the Trial Court.

The point is made that plaintiff's lien (as well as that of Independent) is invalid because he filed one joint lien claim against all the property, whereas there were four separate ownerships. Defendants contrast the lien claims of plaintiff and Independent with the procedure of Gildehaus, who, as they say, filed four separate liens. From the testimony of Gildehaus we see that he made no pretense of keeping separate accounts of the labor and material which went into the buildings of each separate corporation, but simply made an allocation of materials and labor to each group of buildings based on his judgment of what was appropriate. The evidence fairly shows here that material was taken from general stockpiles for any needed purpose and that it was virtually impossible to keep track of the separate items and their ultimate destinations. We note, also, that the Shelby Corporation owned all the capital stock, common and preferred, of each of the "Bird" Corporations except for nominal shares issued to the FHA. The officers of Shelby were the officers of the four corporations, and for all practical purposes Shelby completely dominated and fully owned each of them during all the times in question here. This division of Shelby's ownership was made (a) because the FHA regulations did not permit so large a loan to one corporation; and (b) because the division permitted Shelby to draw its loan money down faster. Shelby acquired title on January 30, 1950; the first work on the project was done on February 6, 1950, under a contract with Shelby; on March 30, 1950, separate tracts were conveyed to the four corporations, and on April 5 they executed their respective deeds of trust.

The otherwise excellent briefs do not cover this point adequately. There can be no question but that Shelby was either the owner of the property or the agent for the four "Bird" Corporations in

contracting with plaintiff. It is also certain that if they be regarded as separate entities, they knew of the work already begun and for which they had contracted with Shelby, and that they would be bound by all liens properly filed and prosecuted thereon. McAdow v. Sturtevant, 41 Mo.App. 220, 227–228; Brown v. Davis, Mo.App., 249 S.W. 696, 698. Plaintiff relies on § 429.040 RSMo 1949, V.A.M.S., as authorizing the filing of one lien where lots are contiguous and the buildings are "erected under one general contract." Defendants say that these properties are separated by streets and are not contiguous. It would appear from the information available, including the agreed statement of facts, that in certain instances the tracts conveyed to these corporations by Shelby would extend to the center of the streets, whereas in others the conveyances as made extended only to the edges of the streets. In the latter event the fee to the streets might remain in Shelby, subject to the right of public use. This, however, will make no difference, in view of our subsequent ruling upon the question of corporate identities. We consider these tracts as contiguous within the ruling of Stamm Electric Co. v. Hamilton-Brown Shoe Co., 350 Mo. 1178, 171 S.W.2d 580, 146 A.L.R. 917. But what the parties fail to recognize is that § 429.040 would certainly seem to contemplate that the contiguous tracts should be under one ownership and that the "one general contract" should be made by, or for, one owner. See Philip Gruner & Bros. Lumber Co. v. Jones et al., 71 Mo. App. 110, 121. We therefore must decide whether the four "Bird" Corporations were truly distinct entities from Shelby. These corporations were created by Shelby for its own convenience and solely to serve its own purposes. Shelby's officers were their officers; Shelby owned all stock except FHA qualifying shares totalling $100 in par value for each corporation; and they were completely dominated by Shelby. The needed construction costs were raised by the incumbrances which these corporations executed, except for the deficiency which

Kapelow claims Shelby suffered and which, undoubtedly, Shelby paid. Under this evidence the four corporations were, for all practical purposes, merely names. While there was no fraud practiced in setting them up, we feel that all the circumstances justify a court of equity in disregarding the legal fiction of corporation existence for this purpose only. The method used by Shelby tended to be misleading to those dealing with it, although the recorded instruments were available. See, generally State of Oklahoma ex rel. Shull v. Liberty National Bank of Kansas City, 331 Mo. 386, 53 S.W.2d 899; Kansas City Wholesale Grocery Co. v. H. T. Poindexter & Sons Merchandise Co., 232 Mo.App. 378, 107 S.W.2d 841; 18 C.J.S. Corporations § 7e, p. 382; Fidelity & Casualty Co. of New York v. Glass, Mo.App., 327 S.W.2d 538; Osler v. Joplin Life Insurance Co., Mo., 164 S.W.2d 295; May Department Stores Co. v. Union Electric Light & Power Co., 341 Mo. 299, 107 S.W.2d 41. In effect, Shelby here created mere straw corporations, and the public should not be prejudiced or inconvenienced. As said in the Kansas City Wholesale Grocery Company case, supra, 107 S.W.2d loc. cit. 843: "This is not a case in which a corporation bought stock in another corporation, nor a case in which there were in fact separate corporate entities. The defendant and New Bargain Stores, Inc., were separate entities only on paper and the acts of the latter were, legally speaking, the acts of the former." So holding, we rule that the filing and prosecution of one lien was sufficient. This applies both to plaintiff's lien and to that of Independent Plumbing and Heating Supply Company, which, incidentally, was a wholly owned subsidiary of the Goldberg Company. No objection is made to the lien claims of Gildehaus, and no specific objections to the others except that the filing of one single lien was improper. It has repeatedly been stated that we should construe our lien statutes liberally.

Since the construction work began on February 6, 1950, under contract with

Shelby, and the deeds of trust were executed on April 5, 1950, after the work was well under way, we hold that all liens involved here are prior to the deeds of trust now held by New York Life. McAdow v. Sturtevant, 41 Mo.App. 220; Joplin Cement Co. v. Greene County Building & Loan Ass'n, 228 Mo.App. 883, 74 S.W.2d 250; Hydraulic Press Brick Co. v. Bormans et al., 19 Mo.App. 664.

■■■■ Plaintiff submits on his appeal that the Trial Court erred in apportioning the costs one half against him and one half against Shelby. Counsel cite § 514.060 RSMo 1949, V.A.M.S. and Huggins v. Hill, Mo., 236 S.W. 1054, and say that plaintiff prevailed, and that Shelby lost as to all opposing parties. A court sitting in equity has much discretion in the allowance and imposition of costs, and it is only where an abuse of discretion is found that the action of the Trial Court should be set aside. Amitin v. Izard, Mo.App., 262 S.W.2d 353; Chapman v. Schearf, 360 Mo. 551, 229 S.W. 2d 552; Oldham v. McKay, 235 Mo.App. 348, 138 S.W.2d 735; Godwin v. Graham, 360 Mo. 418, 228 S.W.2d 789. We find no such abuse here. Plaintiff prevailed, but only to the extent of approximately one half of its total claim; a substantial issue has been found against it.

The Trial Court properly entered judgment for Independent Plumbing and Heating Company for $45,871.67, upon its cross-claim against plaintiff, with interest, and adjudged a mechanic's lien in its favor against the real estate. All items of this lien claim are included in plaintiff's claim against Shelby et al. It rendered judgment for M. F. Gildehaus, Doing Business as M. F. Gildehaus Plumbing and Heating Company, for $15,722.10, with interest, against plaintiff on Gildehaus' cross-claim and adjudged a lien therefor. No objection is made here to this claim or to the lien. Mr. Gildehaus has since died and his administratrix has been substituted. The court also properly adjudged all liens to be prior to the incumbrances, and prior to the inter-

ests of the "Bird" Corporations. It entered judgment for plaintiff and for I. R. Goldberg Plumbing Supply Company on Shelby's counterclaim and cross-claim against them, respectively. It entered judgment for Fidelity and Deposit Company of Maryland on Shelby's cross-claim against it. The judgment incorporated various provisions concerning executions, sale, credits and priorities in payment and application of the proceeds which are not questioned here.

In view of the foregoing the judgment of the trial court is affirmed.

All concur.