STATE OF OKLAHOMA ex rel. C. G. SHULL, Bank Commissioner, v. LIBERTY NATIONAL BANK OF KANSAS CITY, a Corporation, Appellant.—53 S. W. (2d) 899.

Division One, October 22, 1932.*

*McAllister, Humphrey, Pew & Broaddus* for appellant.

*NOTE: Opinion filed at April Term, 1932, September 3, 1932; motion for rehearing filed; motion overruled at October Term, October 22, 1932.

*Hanna & Hurwitz* for respondent.

ATWOOD, J.—This is a suit by the Bank Commissioner of the State of Oklahoma in charge of the affairs of the Bank of Commerce of Okmulgee, Oklahoma, against Liberty National Bank of Kansas

City, Missouri, for an accounting and judgment for balance found to be due plaintiff on certain collateral security pledged by said Oklahoma bank to the Commonwealth National Bank of Kansas City to secure a $20,000 note given by the former to the latter, the name of the latter bank being changed on April 12, 1923, to that of appellant herein. Judgment was rendered in favor of plaintiff and against defendant for $13,579.97, anl it was further ordered, adjudged and decreed that defendant deliver to plaintiff one of the collateral notes known as the Harry-Smith Motor Company note, and also cancel and deliver said $20,000 note to plaintiff. From this judgment defendant has appealed.

It appears from matters stipulated and evidence adduced at the trial that on the 29th day of September, 1921, the Bank of Commerce of Okmulgee, Oklahoma (hereinafter called the Oklahoma Bank), executed its promissory note payable to the Commonwealth National Bank of Kansas City, Missouri, (hereinafter called the Missouri Bank), in the principal sum of $20,000, due December 2, 1921. To secure payment of this principal note, it pledged to and deposited with the Missouri Bank said collateral consisting of ten promissory notes of the aggregate face value of $28,650. On November 2, 1921, the Oklahoma Bank was declared insolvent and placed in the hands of the Bank Commissioner of the State of Oklahoma. On that date the Oklahoma Bank had on deposit with the Missouri Bank $9,432.17 in cash, which the Missouri Bank at once appropriated and credited on the said $20,000 note, leaving a balance due thereon of $10,567.83. On November 28, 1921, one of the customers' notes pledged as aforesaid with the Missouri Bank in the sum of $800 became due, and the customer, Harry Miller, paid the same on its due date to the Missouri Bank. The balance due, therefore, on the $20,000 note on December 2, 1921, the date of its maturity, was $9,767.83, and the face value of the collateral notes securing the same was $27,850. All of these collateral notes were notes of customers of the Oklahoma Bank, all of whom lived in or near Okmulgee, Oklahoma.

On December 3, 1921, one day after the maturity of the principal note, the Missouri Bank published notice of sale in the Daily Record in Kansas City, Missouri, which notice is as follows:

## "NOTICE OF SALE.

"Public notice is hereby given that on Wednesday, December 14, 1921, at 2 o'clock P. M., at the south front door of the Jackson County, Circuit Court House, at Kansas City, Missouri, we, the undersigned, duly appointed and authorized so to do by the terms and provisions of a certain promissory note, now in default, executed by Bank of Commerce of Okmulgee, Oklahoma, dated September 29,

■■ ■■■■■■■■■

1921, No. 17353, for $20,000 to us, and of which we are now the lega.. holder, will sell, at public sale, for cash, various promissory notes pledged as collateral security for the payment of said above described note to satisfy all indebtedness thereon.

"Commonwealth National Bank.

"First publication December 3, 1921."

No actual notice of intention to hold a sale was ever given to or received by the Oklahoma Bank or the Bank Commissioner in charge of its affairs. On the date named in the publication, to-wit, December 14, 1921, the collateral notes were exposed for sale in the manner and at the place set out in the notice, and were bid in by a member of the law firm that had prepared the notice for the Missouri Bank on behalf of the Commonwealth Loan Company for $9,778.33, this being the exact amount of the balance due on said principal note, plus $10.50, the cost of publishing the notice.

It was stipulated at the trial that the Commonwealth Loan Company, the purchaser, was a subsidiary of the Missouri Bank, and its stockholders were identical with the stockholders of the bank. None of its stock was ever actually issued to its stockholders, all shares being held by three trustees, but to each certificate of stock of the bank was attached a rider or a sticker stating that the certificate carried with it a certain pro rata number of shares of the stock of the loan company. It was impossible to own stock in the bank without owning stock in the loan company, and vice versa. The office of the loan company was in one of the rooms of the banking house occupied by the bank and this room was used jointly by the bank and loan company. Although the loan company was a Missouri corporation and not organized under the banking laws of the United States, nevertheless the federal comptroller always examined it when he examined the bank. The parties stipulated that it was "formed for the purpose of handling such paper as Commonwealth National Bank of Kansas City, Missouri, was not authorized to handle or which it was forced to charge off." When the comptroller refused to approve notes or other evidences of indebtedness in the note case of the bank, the criticised paper went to the loan company, sometimes at face value, and sometimes at other agreed prices. It apparently never paid cash for this bad or worthless paper, all transactions being paper transactions. They were usually wiped out and adjusted from time to time by mutual credits and debits, although the books at all times showed a liability from the loan company to the bank. It appears that the loan company never made any profit out of any of these transactions. The reason assigned for this continual passing of paper between the bank and the loan company was

that the Missouri Bank was going through a period of great distress. It was subsequently reorganized and taken over by appellant.

It appears from the evidence that the bidder, whose law firm represented both the bank and the loan company, was told the exact price which he should bid for the collateral by the officials of the bank, and he gave his personal check for the purchase price. On the same day, the loan company reimbursed him after the bank had lent to the loan company $9,778.33, the exact amount necessary for such reimbursement and payment of the cost of publishing the notice.

On the next day after the purported sale, the loan company sold or transferred back to the bank $14,200 in face value of the collateral notes at their full face value. The testimony is vague as to the manner in which the bank paid the loan company for these collateral notes, but the "presumption" of the appellant's witness in this matter was that it was paid for by crediting the loan company with the $9,778.33 which it had borrowed the day before and by passing to the loan company a worthless note of J. Ray Brown for $5,000.

Within a month from the date of the purported sale, all of the collateral notes purchased by the loan company found their way back into the bank, except one note of comparatively little value. Defendant's testimony was vague and uncertain as to the manner in which the bank paid the loan company for the rest of these collateral notes, but the same witness again ventured the assumption that such payment was made by the cancellation of prior liabilities of the loan company to the bank; that is, liabilities of the loan company incurred by it in the purchase of bad or worthless paper from the bank. All of the collateral notes so transferred to the bank by the loan company were transferred before any collections were made on them and for full face value. The loan company never collected anything on any of these notes from the makers thereof. The determination of the time when the collateral notes were to be passed back to the bank depended on "what the chairman and the president (of the bank) wanted to do about it."

Within a month from the date of the sale the Missouri Bank collected approximately $14,000 on these collateral notes, and approximately $18,000 was paid on their first maturity dates. Thereafter the Missouri Bank continued to collect on the collateral notes. In appellant's brief it is admitted that the judgment entry of the trial court shows a correct statement of the monies paid in on the notes and the dates of their payment.

Almost immediately after the Oklahoma Bank was taken over by the State Bank Commissioner a controversy arose as to who should liquidate it. It was finally determined in the courts of that state in the latter part of April, 1922, that it should be liquidated by the

Bank Commissioner, and a liquidating agent was thereupon appointed. The appellant was aware both of the fact of insolvency and of the pending controversy when the purported sale was made. Within a few days after his appointment, the liquidating agent wrote to the Missouri Bank asking if the Missouri Bank would return the collateral, upon payment to the Missouri Bank of the amount due it. The letter further asked for information concerning the collateral notes and their disposition. The Missouri Bank replied as follows:

"THE COMMONWEALTH NATIONAL BANK,
"Kansas City, Missouri
"May 9, 1922.
"Mr. N. S. Barren, Jr.,
"Bank of Commerce,
"Okmulgee, Oklahoma.
"Dear Mr. Barren:
"We are in receipt of your letter of May 5, and wish to advise that the collateral to the Bank of Commerce's notes was sold, in keeping with the collateral agreement.

"We regret to say that this matter has progressed so far that we would not be interested in the suggestion contained in your letter.
"Very truly yours,
"(Signed) R. J. Potts,
"Vice-President."
"RJP:M

On May 10, 1922, one day after the above letter was written, the Missouri Bank instituted suit in the Federal Court of Oklahoma upon one of said collateral notes, known as the Harry-Smith Motor Company note, to compel its payment. In that suit the Bank Commissioner of Oklahoma intervened, asking that he be declared the owner of said note, and made demand in his petition of intervention for an accounting. In that suit the Federal Court in Oklahoma determined the issues in favor of the Bank Commissioner, but the note was still in the possession of appellant herein at the time this suit was tried.

The first three points urged by counsel for appellant are that it was the duty of the pledgee to sell the collateral with reasonable promptness; that the notice of sale was sufficient; and that the purchase price paid for the collateral by the Commonwealth Loan Company was adequate. The remaining points are that the pledgee complied with the terms of the collateral agreement; and that the pledgee had a right to sell to the Commonwealth Loan Company.

Answering these last two points, counsel for respondent contend that "purchase by appellant through its *alter ego,* the Common-

wealth Loan Company, at its own sale, and without express authority in the collateral agreement to so purchase is void and does not change the relation of the parties;'' that ''where a pledgee converts collateral into money, it is the duty of the pledgee to apply the proceeds to the payment of the debt secured and it holds the excess as trustee for the pledgor;'' and that ''the purported sale was made in an attempt to place the title of the collateral in the appellant, in order to cut off respondent's equities and rights of redemption and was therefore void.'' Choosing to consider appellant's last two points first, we quote the collateral agreement above referred to, which was a part of the $20,000 note, as follows:

''To secure the payment of this or any other liability or liabilities of ours to said party, due or to become due, or that may hereafter be contracted, we have hereto attached, as collateral security, the following various notes totalling $——.

''All dividends and maturing coupons pending life of this loan shall be paid to the holder of this note.

''The above collateral has a market value of $——. If in the judgment of the holder of this note, said collateral depreciates in value, the undersigned agrees to deliver when demanded additional security to the satisfaction of said holder; otherwise this note shall mature at once. Any assignment or transfer of this note, or other obligations herein provided for shall carry with it the said collateral securities and all rights under this agreement. And we hereby authorize Geo. E. Ricker, his assigns or the legal holder hereof on default of payment of note or any part hereof, according to the terms hereof to sell said collateral or any part thereof, at public or private sale and with or without notice, and by such sale the pledgor's right of redemption shall be extinguished.

''The undersigned hereby releases the holder of this note from liability of every kind pertaining to the collection or failure to collect, the above mentioned collateral. The provisions hereof shall apply to all notes, drafts, accounts, bonds, stocks held by or in transit to said bank and all other collateral which said bank may at any time hold to secure this and all other obligations of the maker hereof to said bank.''

■■ The first question arising under the respective contentions above stated is whether or not the pledgee, appellant herein, had a right to buy this collateral at its own sale. The general rule is that unless specially authorized to do so a pledgee has no such right. [49 C. J. p. 1006, sec. 265, n. 29; Thornton v. Irwin et al., 43 Mo. 153; Richardson v. Ashby, 132 Mo. 238, 33 S. W. 806; Rush v. First National Bank, 71 Fed. 102; Easton v. German American Bank, 127 U. S. 532.] The collateral agreement above quoted contains no

such express authority. Counsel for appellant say that this authority should be implied from the clause appearing therein, "and by such sale the pledgor's right of redemption shall be extinguished;" that unless these words refer to a purchase by the pledgee they have no meaning. This phrase, or one of like import, frequently appears in collateral pledge agreements and is used even where the agreement specifically provides that the pledgor may buy. See pledge agreement in Dibert v. D'Arcy, 248 Mo. 617, 627, 154 S. W. 1116. Where there is no statutory provision extending the right of redemption for a period after sale is had such a clause may be meaningless. In such case no particular significance can be attached either to its presence or absence, and its use will not serve to supply the lack of specific provision, required by the above rule, in the pledge agreement authorizing the pledgee to purchase. As said in 49 Corpus Juris, page 1009, notes 66 and 67: "If the pledge contract is unambiguous with respect to the right of the pledges to purchase at his sale, it will be literally construed; but if it is ambiguous it will be strictly construed against the pledgee." [Barnett v. Dowdy, 207 Ala. 641, 93 So. 638; Granger v. Pigott, 10 Pa. Dist. Rep. 327; Dibert v. D'Arcy, 248 Mo. 617, 644, 647, 648, 154 S. W. 1116.]

██ It is generally conceded that mere identity of ownership and control is insufficient to establish one corporation as the *alter ego* of another. [14 C. J. p. 58, and other authorities cited by appellant.] But a great deal more is disclosed by the record in this case. It seems plain from the facts hereinabove stated, which were either stipulated or proved at the trial, that the Commonwealth Loan Company was the mere conduit, instrumentality or adjunct through which the Missouri Bank sought to acquire title at its own sale of the collateral in question. In such case corporate entities will be disregarded. [Martin v. Development Co., 240 Fed. 42, 45; 14 C. J. p. 61, sec. 22, n. 78.] The Missouri Bank was thereafter in no better position than if it had directly purchased the notes at the sale. Having no specific authority under the pledge agreement so to do the sale was defective. ██ But, even so, counsel for appellant contend that the sale was not void but merely voidable; that at the instance of pledgor the sale might have been set aside and its right of redemption restored; and that respondent has not sought and does not now seek this remedy.

It is true that a defective purchase does not dissolve or change the relation of pledgor and pledgee, and is not void except in case of actual fraud, (49 C. J. p. 1006, notes 30 and 31), but it does not follow that respondent has failed to pursue a proper remedy. In his petition plaintiff alleged execution and delivery of the principal note and contract pledging the collateral in question together with

delivery of this collateral to the pledgee, and further alleged on information and belief that enough of the collateral had been collected to more than pay the balance due on said principal note, after certain alleged payments had been made thereon, and that plaintiff ''has not been able to ascertain or learn the true amount actually due and owing to your petitioner in the liquidation of said bank, and that said defendant should be required and compelled to render a true and complete accounting, showing the amount of monies collected from the assets of said bank and the amount of funds actually held by the defendant, which was the property of said bank at the time of its failure, and that your petitioner has demanded that such a settlement be made, but the defendant has failed, neglected and refused to make such accounting or settlement.'' Plaintiff prayed that defendant ''be required to come into court and render an accounting and make a true return of all of the funds which came into its possession as property of the Bank of Commerce, Okmulgee, insolvent, and that it be further required to report what interest in addition to the principal on all of said collateral that was collected by it, and that it be required to account for the balance which was on deposit in the Commonwealth National Bank on or about the date of the failure of the Bank of Commerce aforesaid, and that the defendant be required to· pay over to this plaintiff in the liquidation of the Bank of Commerce aforesaid all monies which are due, owing and unpaid to the Bank of Commerce of Okmulgee, and that it be required especially to account for all funds after the indebtedness of the Bank of Commerce to the Commonwealth National Bank has been fully satisfied and paid, and that it recover such other, further and additional relief in equity as it may be entitled to receive in this action, and that it recover its costs herein expended and such other relief as to the Court may seem just and right.''

The fact and manner of sale of the collateral first appear in defendant's answer, which also contains the following allegation of independent purchase and admission of demand made by plaintiff:

''Defendant alleges that thereafter these notes, none of which was then due, were purchased by it from the Commonwealth Loan Company and it thereby became the absolute owner of said notes for value, and that thereafter any money received from collections or settlements of said notes became and was the absolute property of the defendant.

''Defendant states further that it was put to great trouble and expense in collecting, settling, and attempting to collect the collateral notes, to-wit, to the amount of and of the reasonable value of $1,000 in expenses and to the amount of and of the reasonable value of

$1,500 attorneys' fees and not for a period of two years and until all of the notes, save one, had been collected or adjusted, did the plaintiff or any one for him make any demand of defendant for the notes or the proceeds thereof, or make any claim of any interest therein and then only by way of intervening in a suit brought in the State of Oklahoma by defendant herein to collect part of the last one of said collateral notes.''

In connection with the above admission of demand made by plaintiff it may again be observed that within a few days after the Bank Commissioner's right to take charge of and administer the affairs of the Oklahoma Bank had been judicially determined, and about six months after the Oklahoma Bank failed, the Bank Commissioner of Oklahoma inquired of the Missouri Bank as to its disposition of the collateral with a view to paying off the principal note and securing a return of the remainder of the collateral, and the Missouri Bank's brief response was that the collateral had been sold ''in keeping with the collateral agreement'' and it ''would not be interested in the suggestion contained in your letter.'' On the very next day the Missouri Bank commenced suit in the Federal Court in the State of Oklahoma on the remaining uncollected collateral note, and it was in this suit that plaintiff herein intervened asking, among other things, that the Missouri Bank be required to cancel and return to intervenor the principal note given for $20,000, and that the Missouri Bank render a strict accounting for all sums of money collected and realized from the collateral security put up with said note.

Recurring to the pleadings, we find that plaintiff replied denying all new matter set up in defendant's answer, and alleged that ''the pretended sale of the collateral attached to the Twenty Thousand ($20,000) Dollar note of the plaintiff as partially set out and described in defendant's amended answer, was fraudulent, illegal and void and was made in bad faith by the defendant in attempting to foreclose upon the equity of redemption in this plaintiff on said collateral notes'' for reasons specifically stated. This return was not challenged by motion or other pleading.

From the foregoing it not only appears that plaintiff and defendant were at issue on defendant's allegation that it purchased the collateral notes from the Commonwealth Loan Company and thereby became the absolute owner thereof for value, but plaintiff also charged that defendant's alleged sale of the collateral was a mere pretense, fraudulent, illegal and void, and made in bad faith by defendant in attempting to foreclose plaintiff's equity of redemption therein. It is also apparent from the pleadings and proof that within a reasonable time plaintiff made demand and offered to do

equity. A pledgor, upon being informed of an unauthorized sale by the pledgee, may sue the pledgee in equity to recover the property, or to recover the proceeds thereof. [49 C. J. p. 1011, notes 9 and 10; Schaaf v. Fries, 90 Mo. App. 111, 116, 117.] The remedy invoked was available to plaintiff and under all the evidence plaintiff was entitled to the relief given.

The first three points made by appellant have been carefully considered but need not be ruled because even if sustained they would not change the result reached herein.

The judgment is affirmed. All concur, except *Ragland, J.*, who concurs only in result.