CONSOLIDATED SUN RAY, INC., Appellant,

v.

Michael OPPENSTEIN, Appellee.

CONSOLIDATED SUN RAY, INC., and Berkson Brothers, Inc., Appellants,

v.

Michael OPPENSTEIN, Appellee.

Nos. 17437, 17536.

United States Court of Appeals
Eighth Circuit.

Aug. 17, 1964.

Richmond C. Coburn, of Coburn, Croft & Kohn, St. Louis, Mo., made argument for Consolidated Sun Ray, Inc., and filed brief with Alan C. Kohn, of Coburn, Croft & Kohn, St. Louis, Mo., F. Philip Kirwan and Charles W. Medley, of Margolin & Kirwan, Kansas City, Mo., and Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa.

David Skeer, of Sheffrey, Ryder & Skeer, Kansas City, Mo., made argument for appellee and filed brief.

Before VOGEL, MATTHES and BLACKMUN, Circuit Judges.

VOGEL, Circuit Judge.

This suit, originally commenced in the Circuit Court of Jackson County, Missouri, at Kansas City, sought a declaratory judgment by Michael Oppenstein against appellant Consolidated Sun Ray, Inc., (Consolidated) and Berkson Brothers, Inc., (Berkson), with respect to a lease entered into on December 4, 1939, by Oppenstein and his since deceased brothers as Lessors and Berkson as Lessee. Oppenstein asked judgment declaring Consolidated liable under the lease on the theory that Berkson was the wholly owned subsidiary of Consolidated, under its complete domination and control beginning in June 1955 and continuing thereafter, and was accordingly the alter ego of Consolidated and as a result thereof Consolidated was liable on the lease as though it were in fact a named lessee. Diversity of citizenship and the amount involved justified removal to federal court.

Between March 18 and March 21, 1963, the case was tried solely on the issue of liability with a jury empaneled to decide Berkson's liability and to determine Consolidated's liability on an advisory basis only. The jury returned a verdict against Berkson and an advisory verdict against Consolidated. On March 27, 1963, judgment was entered against Berkson on the jury's verdict with the provision that it would become final upon entry of judgment on the claim against Consolidated. On April 5, 1963, the court made its Findings of Fact and Conclu-

sions of Law [1] and, based thereon, entered a declaratory judgment holding Consolidated also liable on the lease. Such judgment was entered on that date against both Berkson and Consolidated.[2] On July 12, 1963, Oppenstein filed a "Motion for Further Relief Based on a Declaratory Judgment" by which he sought a determination of the amount of damages which had accrued to July 1, 1963. On October 22, 1963, before submitting the case to a jury, the District Court entered an interlocutory order holding, *as a matter of law*, that Oppenstein was under no duty to mitigate damages. On October 24, 1963, the case again went to trial before a jury and on October 25, 1963, the jury returned a verdict in favor of Oppenstein and against Consolidated and Berkson in the sum of $102,674.73 as appellee's damages to July 1, 1963, plus attorneys' fees in the sum of $10,000. Judgment of $112,674.73 was entered thereon, from which judgment Consolidated and Berkson noticed appeals to this court. On December 23, 1963, this court directed that the appeals be consolidated for briefing and submission.[3]

■ At the threshold we are met with Oppenstein's motion, filed by mailing on January 22, 1964, to dismiss the appeals because Consolidated had filed a "fraudulent supersedeas bond" by a company neither qualified nor authorized to write supersedeas bonds by which delay was purposely obtained and that the appellants therefore come into this court of equity with unclean hands. We have reviewed the record with reference thereto, have considered the arguments of the parties as to the merits of the motion to dismiss, and, noting that Consolidated did, after the abortive attempt to file an improper bond, file a proper bond which

was duly authorized and approved by the District Court, we hereby direct that the motion to dismiss be denied.

Appellant Consolidated bases this appeal upon the following grounds:

"1. The District Court erred in holding that the separate corporate entity of Berkson should be disregarded and that Berkson was the alter ego of Consolidated.

"2. The court below erred in refusing to admit relevant evidence relating to damages and Oppenstein's failure to mitigate."

■ The lease or contract between Oppenstein and Berkson was executed in the State of Missouri, was to be performed there and pertained to property located therein. Accordingly, the case is to be determined by the substantive law of Missouri.

■ Preliminarily, it is urged by the appellant that this court has broad discretion in reviewing the "alter ego" issue which was tried to the court with an advisory jury, citing United States v. Mississippi Valley Barge Line Co., 8 Cir., 1960, 285 F.2d 381, 388; Sun Insurance Office Limited of London v. Be-Mac Transport Co., 8 Cir., 1942, 132 F.2d 535; United States v. Mitchell, 8 Cir., 1939, 104 F.2d 343, 346. In the cases relied on by Consolidated, the issues presented were either on fact stipulations, documentary evidence or without conflict thereon. This case was presented to the court and the advisory jury, not only with documentary evidence but a number of witnesses who testified personally. The court on April 5, 1963, filed its Findings of Fact and Conclusions of Law based upon disputed testimony. This court is bound by Rule 52 of the Federal Rules

1. Published at 216 F.Supp. 268.
2. Berkson did not join in a notice of appeal therefrom filed June 20, 1963, which became our No. 17,437. This notice of appeal was given only by Consolidated as to the judgment of the District Court entered April 5, 1963.
3. Berkson was named in this notice of appeal, filed December 10, 1963, appealing from the above judgment. This became our No. 17,536. The brief of appellant states only that it is filed on behalf of Consolidated. Therefore, the District Court's judgments of April 5 and and October 25, 1963, stand insofar as Berkson alone is concerned. Counsel for Consolidated stated during the course of oral argument in rebuttal that Berkson had abandoned its appeal.

of Civil Procedure, 28 U.S.C.A., and the often-cited remarks of the late Judge John Sanborn in Cleo Syrup Corp. v. Coca-Cola Co., 8 Cir., 1943, 139 F.2d 416, at page 417, 150 A.L.R. 1056, wherein he said:

"  *   *   * This Court, upon review, will not retry issues of fact or substitute its judgment with respect to such issues for that of the trial court. Storley v. Armour & Co., 8 Cir., 107 F.2d 499, 513; Gasifier Mfg. Co. v. General Motors Corporation, 8 Cir., 138 F.2d 197, 199; Travelers Mut. Casualty Co. v. Rector, 8 Cir., 138 F.2d 396, 398. The power of a trial court to decide doubtful issues of fact is not limited to deciding them correctly. Thompson v. Terminal Shares, Inc., 8 Cir., 89 F.2d 652, 655; Pittsburgh Plate Glass Co. v. National Labor Relations Board, 8 Cir., 113 F.2d 698, 701 (affirmed 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251); Travelers Mutual Casualty Co. v. Rector, supra. In a non-jury case, this Court may not set aside a finding of fact of a trial court unless there is no substantial evidence to sustain it, unless it is against the clear weight of the evidence, or unless it was induced by an erroneous view of the law. Aetna Life Ins. Co. v. Kepler, 8 Cir., 116 F.2d 1, 4, 5; Gasifier Mfg. Co. v. General Motors Corporation, 8 Cir., 138 F.2d 197, 199; Travelers Mutual Casualty Co. v. Rector, supra. The District Court, in making its findings, was under no misapprehension as to the applicable law. See Kann v. Diamond Steel Co., 8 Cir., 89 F. 706, 707; My-T Fine Corporation v. Samuels, 2 Cir., 69 F.2d 76, 77; Armstrong Paint & Varnish Works v. Nu-Enamel Corporation, 305 U.S. 315, 335, 336, 59 S.Ct. 191, 83 L.Ed. 195. In determining whether there is a sufficient evidentiary basis for the court's findings of fact, we must take that view of the evidence and the inferences deducible therefrom which is most favorable to the plaintiff."

The District Court, in its Findings of Fact, which, after examination, we conclude were based upon substantial evidence in the record, found that all of the stock of Berkson was owned by Consolidated; that on December 4, 1939, Oppenstein leased certain property to Berkson for a term of 26 years and 11 months ending June 30, 1967; that prior to June or July 1955 Berkson was the sole obligor as lessee under the lease; that after June or July 1955 Consolidated made certain changes in its dealings with its wholly-owned subsidiary Berkson, such as (a) eliminated Berkson's control of money received from its retail store which was operated at the leased premises and reserved to Consolidated alone the right to issue checks on the bank account deposited in the Commerce Trust Company in Kansas City; (b) in 1959 closed the bank account, opening a new one in Consolidated's name so that thereafter Berkson operated without an account in its own name; (c) pledged Berkson's accounts receivable as security for a loan Consolidated negotiated for itself from Walter Heller and Company; (d) took from Berkson its former independent buying discretion and merchandising policies, buying merchandise for Berkson in New York and warehousing it in its own building in New York and directed complete retail price details; (e) changed fire and liability insurance on the leased premises from the name of Berkson to Consolidated; (f) prepared in New York and completely controlled all advertising; (g) arranged so that the directors and officers of Berkson were persons employed by Consolidated and were the same persons who were directors or officers of Consolidated, and no director or officer of Berkson lived in the Kansas City, Missouri trade area, and the local store manager was not a director or officer of Berkson; (h) charged against Berkson a share of the cost of Consolidated's accounting and warehousing operations; (i) in 1956, just after the

change-over, Consolidated entered into a Chapter XI Reorganization Plan under the Bankruptcy Laws. At the same time Berkson's operating costs increased despite reductions in personnel; (j) in 1956 Berkson's sales dropped $224,000 and its merchandise cost for inventory was reduced by Consolidated in the amount of $220,000; (k) many of the corporate minutes of Berkson were printed forms apparently used by Consolidated for all of its subsidiaries, with the name "Berkson's" typed in; (l) all correspondence pertaining to the business of the lessee under the lease, whether written to the lessor, to third parties or to agents of Consolidated, was on Consolidated's letterhead and was for the most part signed "Consolidated Retail Stores by"; in such correspondence Consolidated referred to the lease, the leasehold estate and the demised premises as "its lease", "its property" and "its rent"; (m) Consolidated employed a realty firm and in letters exchanged between the two companies and third parties, efforts were made for Consolidated to sell the leasehold estate for a consideration to be paid to Consolidated; (n) in October 1961 the retail store on the leased premises was closed and the inventory was sold to Macy's; the consideration therefor was paid to and kept by Consolidated, no part being made available to apply on the rent due Oppenstein for November 1961 or thereafter; (o) Consolidated operated Berkson the same as if it were one of the division stores of Consolidated rather than a wholly-owned subsidiary; (p) Consolidated did maintain substantially all the legal formalities required of Berkson as a separate corporation, such as filing necessary papers, reports and corporate tax returns.

The court also found there was a default in the payment of rent beginning November 1961 with notices, etc. From these findings the District Court made its Conclusions of Law:

1. That Consolidated had complete and absolute control over the actions and rights of Berkson from and after July 1955; that Consolidated used its power and control for the benefit of Consolidated and not for the benefit of Berkson;

2. That from June or July 1955 Consolidated did not respect the separateness of the corporate entity of Berkson, treating Berkson as a division, department, or adjunct of Consolidated; caused Berkson's assets to be intermingled with its own, making Berkson the alter ego of Consolidated;

3. That the use by Consolidated of Berkson as a division, conduit or instrumentality of Consolidated and Berkson's loss of control of its own destiny and inability to protect its own assets and the imposition of excessive financial burdens on Berkson was an injustice to Oppenstein, who sustained damage thereby;

4. That Consolidated should be held liable for the actions and obligations of Berkson, the same as though they were the acts and obligations of Consolidated.

Obviously, Consolidated's testimony and evidence and the deductions which could be drawn therefrom indicated contrary conclusions. Consolidated asserts that there was nothing improper in its domination of Berkson and that the new arrangement beginning in 1955 was for the benefit of Berkson and Oppenstein as well; that by its beneficial control of Berkson it enabled that company to stay in business years longer than would otherwise have been possible. It cites as the leading case in Missouri on the question of piercing the corporate veil May Department Stores Co. v. Union Electric Light & Power Co., Mo., 1937, 341 Mo. 299, 107 S.W.2d 41. It also cites and relies on Eisenbarth v. Equity Mutual Ins. Co., St. Louis C.A., 1945, 189 S.W.2d 168, where the court refused to pierce the corporate veil because there was no showing of improper purpose. In Eisenbarth the court said, at page 171:

"Therefore the question in this case, as in all such cases, is not whether there was an intercorporate affiliation as between Reciprocal Exchange and Equity Mutual, but rather the question is, was such

relationship used to accomplish an improper purpose or of perpetrating a fraud or promoting injustice. Although Reciprocal Exchange and Equity Mutual are both shown to be a part of the general set-up referred to as 'Bruce Dodson Companies,' the evidence is that *each had a separate office, each engaged in a separate class of insurance business, and each made its own report to the State Insurance Department, and each was created under different statutory authority * * *.* It takes more than a showing of an interlocking directorate and the interest of Bruce Dodson in all of the affiliated organizations to break down the separate entity of each, and such showing would have to be that such connection or affiliation was used to perpetrate a wrong on Powell Brothers, and we find no such evidence in the case." (Emphasis supplied.)

The court went on to say that there was a total failure of evidence showing any connection on the part of Equity Mutual with the alleged fraud and bad faith of Reciprocal Exchange.

██  From the evidence in this case there can be no reasonable doubt but that Consolidated did completely control and use Berkson as a mere conduit, instrumentality or adjunct of Consolidated itself. The ultimate fact question for determination, then, was Consolidated's purpose in so doing. If that purpose was unlawful or improper or for some illegitimate purpose which might result in damage to Oppenstein, then the court has the power to look behind Berkson, the alter ego, and hold Consolidated liable for Berkson's obligations. This necessitates a determination by the trier of the facts. Here the court, with the aid of an advisory jury, found against Consolidated on that issue. The law of Missouri is that, where the subsidiary is a mere conduit, instrumentality, or adjunct through which the parent corporation achieves some improper end, its own corporate entity will be disregarded. Schwartz v. Shelby Construction Co., Mo.

Sup., 1960, 338 S.W.2d 781, 794; Osler v. Joplin Life Ins. Co., Mo.Sup., 1942, 164 S.W.2d 295, 297; May Department Stores Co. v. Union Electric Light & Power Co., 1937, 341 Mo. 299, 107 S.W. 2d 41, 54; State ex rel. Shull, Bank Commissioner v. Liberty National Bank of Kansas City, 1932, 331 Mo. 386, 53 S.W. 2d 899, 902; Phillips v. St. Louis & S. F. R. Co., 1908, 211 Mo. 419, 111 S.W. 109, 113, 17 L.R.A.,N.S., 1167.

Both parties cite, quote from and rely on May Department Stores Co. v. Union Electric Light & Power Co., supra, as being the leading case in Missouri on the question of piercing the corporate veil. In May, the parent owned the subsidiary, as in the instant case; both companies had the same offices and the same manager, as herein; the parent corporation paid the payroll of the subsidiary and all other expenses, as in the present case; the parent paid the subsidiary's plant rent, as in the instant case; all receipts by the subsidiary were turned over to the parent, as was the fact herein; intercompany accounts recorded credits and debits from the moneys taken in and expended as between the two, as in the instant case; the subsidiary maintained its apparent separate identity for customer relation purposes, as in the instant case; and, as is true herein, all corporate reports were made in the name of the subsidiary in order to preserve its paper identity. In finding an improper purpose had been established in that case, the Supreme Court of Missouri said at page 55 of 107 S.W.2d:

"* * * It does seem, however, that the determination of whether there is a case for equitable relief could and should be decided by the test of whether or not the arrangement involved is being used for a proper purpose. Should not all these other suggested tests be used only as aids for determining the true purpose of the arrangement? *Making a corporation a supplemental part of an economic unit and operating it without sufficient funds to meet obligations to those who must deal with*

*it would be circumstantial evidence tending to show either an improper purpose or reckless disregard of the rights of others.* Equity sets aside legally sufficient conveyances if their purpose is to defraud creditors. If any intercorporate affiliation is devised for or is being used to accomplish an improper or unlawful purpose, certainly equity does have the authority to tear down technical legal barriers and reach beyond them to impose liability or grant proper relief. If the purpose is lawful, and fair and equitable to those with whom it is intended to deal, legal forms and relationships should be observed. Men have the right to use legal forms which they believe to be helpful in accomplishing proper purposes." (Emphasis supplied.)

In Osler v. Joplin Life Ins. Co., Mo.Sup., 1942, 164 S.W.2d 295, 298, the Supreme Court of Missouri said:

" * * * The affairs of the corporations named were completely managed and controlled by those named, including the appellant corporation. The corporations were used as instrumentalities to achieve the purpose of the persons above named. There is no merit in appellant's points. 18 C.J.S. 376 to 385, Corporations, §§ 6, 7. At page 382 we find the following: 'The rule followed in many cases is that the legal fiction of distinct corporate existence may be disregarded where a corporation is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality or adjunct of another corporation. The courts will ignore separate corporate entities in order to defeat a fraud, wrong, or injustice, at least where the rights of third persons are concerned.' "

In Darling Stores Corporation v. Young Realty Co., 8 Cir., 1941, 121 F.2d 112, 115, certiorari denied, 314 U.S. 658, 62 S.Ct. 111, 86 L.Ed. 527, suit was brought against Darling Shops, Inc., and Darling Stores Corporation, charging that Darling Shops, Inc., was the mere adjunct, agent and instrumentality of Darling Stores Corporation; that the latter wholly dominated, directed, and controlled the former and was directly liable to the appellee realty company on the lease assumed by Darling Shops, Inc. This court affirmed the judgment of the District Court, holding Darling Stores Corporation liable on the lease, saying:

"The findings of the trial court, abundantly supported by the evidence, identify the partnership and its corporation successor as constituting the same business entity. Darling Shops, Inc., existed only to serve the parent organizations—the partnership first, and Darling Stores Corporation subsequently. * * * In such case it is well settled law, as stated by this court in Chicago Mill & Lumber Co. v. Boatmen's Bank, 8 Cir., 234 F. 41, 45, that 'when one corporation owns or controls the entire property of another, and operates its plant and conducts its business as a department of its own business, or as its alter ego, it is responsible for its obligations incurred in so doing.' "

The only apparent distinction between Darling and the instant case is that in Darling the subsidiary never operated the business in question, but served only the function of making the lease. In the present case, from and after June 1955 Berkson never actually operated the business, but served as the nominal lessee. In both cases, the subsidiary ended up serving completely the interests of the dominant corporation.

See also Wabash Ry. Co. v. American Refrigerator Transit Co., 8 Cir., 1925, 7 F.2d 335, 343; Edward Finch Co. v. Robie, 8 Cir., 1926, 12 F.2d 360. The rule so followed in Missouri and by this court is generally followed elsewhere. Henderson v. Rounds & Porter Lumber Co., D.C.W.D.Ark., 1951, 99 F.Supp. 376, 381, was an action by a trustee in bankruptcy and certain creditors of the bankrupt corporation against a corporate stockholder. The plaintiffs alleged that

the defendant corporation converted the assets of the bankrupt corporation by its control over the bankrupt corporation and by its manipulation of the affairs of the latter. There Judge John E. Miller stated the applicable rules as to corporate responsibility for the acts of its alter ego as follows:

"In order to fix liability directly on defendant, the court must ignore the separate corporate entity of the Flooring Company. Normally, courts will and must respect such separate existence, but when, under the facts of a particular case, the administration of justice so requires, the fiction of corporate legal entity may be brushed aside and responsibility placed where it belongs. As stated in Nichols & Co. v. Secretary of Agriculture, 1 Cir., 131 F.2d 651, 655, quoting from Owl Fumigating Corporation v. California Cyanide Co., 3 Cir., 30 F.2d 812, 813: 'When, as against the general rule that two separately incorporated companies are separate and distinct entities, it is charged that one is a mere agency or department of the other and is used as an instrumentality to perpetrate fraud, justify wrong, avoid litigation or render it more difficult, or generally to escape liability for what are in substance its own acts, courts will put aside the screen and, looking upon the situation through the group of negative rules, determine affirmatively the truth and place responsibility where it actually belongs.' "

In Chicago, Milwaukee & St. Paul Ry. Co. v. Minneapolis Civic & Commerce Association, 1918, 247 U.S. 490, 501, 38 S.Ct. 553, 557, 62 L.Ed. 1229, the court stated:

"While the statements of the law thus relied upon are satisfactory in the connection in which they were used, they have been plainly and repeatedly held not applicable where stock ownership has been resorted to, not for the purpose of participating in the affairs of a corporation in the normal and usual manner, but for the purpose, as in this case, of controlling a subsidiary company so that it may be used as a mere agency or instrumentality of the owning company or companies."

We hold here that Consolidated's complete and absolute control over Berkson, making Berkson a supplemental part of Consolidated's economic unit, and operating Berkson without sufficient funds to meet its obligations to its creditors, constituted circumstantial evidence from which the advisory jury and the court, as the finders of the facts, could reasonably draw the inference that Consolidated's purpose was improper and was detrimental to Oppenstein. Such inference is sustained by substantial evidence. It may not be disturbed here on appeal.

Appellant's second claim of error is to the effect that the court below erred in refusing to admit relevant evidence relating to damages and Oppenstein's failure to mitigate. On October 22, 1963, the District Court, before presenting the damage issue to a jury, entered an interlocutory order holding, as a matter of law, that Oppenstein was under no duty to mitigate damages. We have come to the conclusion that the court was in error in so holding.

The lease between Oppenstein and Berkson provided, *inter alia:*

"If the Lessee shall fail to pay any rent reserved herein when due, and such default shall continue for ten (10) days after receiving written notice of such default, or if Lessee shall fail to perform any of the other obligations of this lease, and shall have received written notice thereof and has not cured such other default within thirty (30) days after such said notice, then this lease shall ipso facto end and terminate, and no subsequent act of the Lessee shall reinstate said lease; but, nevertheless, such termination shall not release Lessee or any of its obligations hereunder, but Lessee shall remain bound for the full rental reserved hereun-

der, together with eight (8) per cent interest thereon from due date thereof until paid, together with a reasonable attorney's fee for collecting the same. If, however, it does cure said default within the time herein provided, it shall be entitled to all of its rights as if no default had occurred. In the event any default be not cured within the time provided herein, then in addition to all other rights and remedies that the Lessors may have, they may enter upon and take possession of said premises with or without force, and relet the same to any person at such rental as Lessors can then obtain but the Lessor shall not be obligated so to do; and the Lessee shall continue and remain liable for any difference between the rent reserved hereunder and the rent contracted for by the new tenant; and should the building remain vacant, then the Lessee shall remain liable for the entire rent reserved hereunder, together with interest at eight (8%) per cent per annum from the date of default."

On November 20, 1961, Oppenstein's attorney wrote to Consolidated, stating in part as follows:

"This additional notice is to advise you that the Lessor is now proceeding to avail itself of the remedies provided for in said lease and by law, that as your agent and for your account and at your cost and expense the Lessor will take all steps necessary or advisable to protect the premises, that as your agent and for your account and at your cost and expense the Lessor will attempt to relet the premises to a suitable and responsible concern,—all for the purpose of mitigating damages. If the Lessor is successful in reletting the premises as your agent and for your account, you will be credited for all amounts so received, less costs and expenses in reletting the property, against the rent and other sums due by you under the lease. If there is a suitable and responsible concern

to whom you may wish to sublet the premises, please let us or the Lessor know at once, for the Lessor will be glad to cooperate with you in the mitigation of the damages."

Thereafter the keys to the premises were returned to Oppenstein and he entered into possession, hired a watchman to take care of the premises and did on occasion relet a small portion of the premises for very short periods of time. He received therefrom a total of $1,825. At the trial Consolidated offered to prove that Oppenstein, after retaking possession, offered the premises at a rental much greater than that provided for in the lease and that Oppenstein did not use reasonable diligence to relet the premises as it was claimed he was obligated to do in order to mitigate damages. However, based upon its interlocutory order of October 22, 1963, determining as a matter of law that there was no duty on the part of Oppenstein to mitigate damages, the District Court refused the offer. Specifically, Consolidated offered to show: That on March 6, 1963, the agent for Oppenstein wrote H. V. Jones & Company, stating the rental for the whole building was $40,000 per year net for the entire building; that on August 2, 1963, Oppenstein's agent wrote Joe Glickman, of Margo's La Mode and offered to lease the first two floors and basement of the building at a minimum rental of $40,000 per year against a proper percentage, or the entire building for $40,-000 per year net against percentage, taxes and insurance amounting to about $20,000 per year. The Berkson lease with which we are here concerned provided for a scale of rent: First, a lower rent by period of time, but the rent commencing after July 1947 to the end of the term was in the amount of $2,272.50 per month for the basement and lower five floors of the eight-floor building.

On the question of Oppenstein's diligence and good faith in attempting to lease the premises, Consolidated offered to show, in addition to the offer of proof regarding the excessive rental Oppenstein demanded, the following: That

Bond Stores, in May of 1963, offered to rent the premises for $35,000 per year for the basement, first floor and mezzanine but that Oppenstein expressed no interest in the deal; that Zale Jewelry wanted to lease a portion of the premises but Oppenstein was not interested; that Margo's La Mode was interested in the property but that Oppenstein asked a minimum rental of $40,000 per year which was more than the Berkson rental, and the negotiations broke down; that Oppenstein stated, at least on one occasion, that he was not interested in renting the building because he was an old man, a bachelor, that he had plenty of money and no one to leave it to, and that if he made any money he would have to pay it to the government for income taxes anyway.

Both parties assert that the law of Missouri is accurately stated in the case of Babcock v. Rieger, K.C. C.A., 1934, 76 S.W.2d 731, 735, as follows:

"Counsel for the defendants say:

" 'On default of tenant the landlord has three options:

" 'Option 1.—To remain out of possession, treat term as subsisting, and recover rent.

" 'Option 2.—Give notice to tenant, resume possession and relet to mitigate damages, collecting loss from tenant.

" 'Option 3.—Reenter, resume possession in own right and close the term. If no notice is given and landlord resumes possession, he is deemed to be doing so to terminate the lease.'

"Counsel have correctly stated the law. Jennings v. First National Bank, 225 Mo.App. 232, 30 S.W.(2d) 1049; Von Schleinitz v. North Hotel Co., 323 Mo. 1110, 1131 et seq., 23 S.W.(2d) 64.

"The plaintiff's action is based upon the theory that he remained out of possession and treated the term as subsisting. Hence, the action must fail if it were conclusively shown that the facts brought the case within the rule stated in either option 2 or 3; and, if there were a conflict in the evidence on that subject, the question was one for the jury."

The Missouri law, as represented by the Babcock case, is in accord with the law generally on this subject. In 52 C.J.S. Landlord and Tenant § 552, p. 364, it is stated as follows:

" * * * Similarly, where a lease has been repudiated by a tenant and the premises abandoned, and there are no covenants in the lease to the contrary, the landlord may rest on his contract and sue for each installment of rent as it falls due, or he may take possession of the premises, relet them, and recover from the tenant any damages suffered thereby."

The District Court, also conceding that Babcock correctly states the law of Missouri, said, in its order of October 22, 1963 finding no duty on the part of Oppenstein to mitigate the damages:

"Plaintiff takes the position that the present situation is covered by option #1. Defendant maintains that plaintiff by its acts has elected option #2. The Court would agree with defendant that, although mitigation is not normally the rule where the plaintiff is suing for less than the total damages under the lease, if plaintiff has elected option #2, then plaintiff is under a duty to mitigate. Defendant relies on plaintiff's exhibit 40 which was captioned 'Notice.' In that letter plaintiff notified defendant that it was availing itself of the remedies under the lease and would attempt to relet. However * * * [a]s the letter sets out, it does not appear that plaintiff Oppenstein went into possession on its own, rather it was holding the premises in order to protect them and to protect Consolidated, not in order to hold adversely to Consolidated. * * *

* * * * * *

"The Court is of the opinion that the 'holding' in the present case is a

·compulsory one brought about [by] Consolidated's default, and that there is no showing that Oppenstein has elected option #2. The Court finds rather that Oppenstein has elected option #1, and therefore is under no duty to mitigate damages."

Where the District Court erred was in overlooking the statement in Babcock that " * * * if there was [is] a conflict in the evidence on that subject, the question was [is] one for the jury." There was indeed a conflict in the evidence on the subject of which option was applicable and in determining that conflict as a matter of law, the court took from the jury the right to answer the question. Consolidated offered to prove that Oppenstein had elected to pursue option #3 by demanding a rental of $40,000 per year which was greatly in excess of the $26,260 per year allegedly due under the lease to Berkson. The offer should have been received for the purpose of showing that Oppenstein had in fact elected option #3 and that therefore, in spite of the statements contained in his attorney's letter, he had actually resumed possession in his own right and not as an agent for Berkson. If Oppenstein were acting as an agent for Berkson, as his attorney's letter indicated he wished to do, he would not, in good faith, have been justified in demanding a rental in excess of what Berkson owed. A reasonable inference from Oppenstein's exorbitant demands—far greater than the provisions of the lease called for—is that he had resumed possession in his own right and not as an agent for Berkson. The other offers of proof to the effect that legitimate offers to rent the premises were made and refused by Oppenstein might have been considered by the jury as indicating a complete lack of good faith on Oppenstein's part in attempting to relet the premises to a suitable and responsible concern, as referred to in Oppenstein's attorney's letter of November 20, 1961, and as provided for in the lease, supra. In denying Consolidated's offers of proof, and in holding as a matter of law that Oppenstein had elected option #1 under Babcock, the court was in error. The jury should have been allowed to determine which option was applicable and what amount, if any, Consolidated should receive as credit in mitigation of damages.

As to the first issue wherein the court and jury held Consolidated liable, this case is affirmed. On the second point, it is reversed and remanded to the District Court for the fact determination of mitigated damages.

One-half of the costs in this Court on appeals to be taxed against Michael Oppenstein.