**CAMELOT CARPETS, LTD., Interstate Supply Company, Standard Floor Covering, Inc., Plaintiffs–Respondents,**

v.

**METRO DISTRIBUTING COMPANY, Harold L. Ehrhard, Ray W. Schwebel, William A. Ratteree, and Adolph Investment Company, Defendants–Appellants.**

No. 41774.

Missouri Court of Appeals,
Eastern District,
Division Four.

Sept. 16, 1980.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 17, 1980.

Application to Transfer Denied
Dec. 15, 1980.

William J. Travis, Donald U. Beimdiek, St. Louis, for defendants–appellants.

Harold Ehrhard, Donald H. Clooney, Dempster K. Holland, St. Louis, for plaintiffs–respondents.

SMITH, Presiding Judge.

Defendants appeal from the judgment of the circuit court in a court–tried case. Judgment was rendered against both Metro Distributing Company and Adolph Investment Company in favor of each of the three plaintiffs as follows: Camelot Carpets, Inc.–$21,578.17 plus interest; Standard Floor Covering, Inc.–$5,975.92 plus interest; Interstate Supply Company–$4,610.10 plus interest. The court ordered Adolph to pay the judgment to trustees to be appointed by the court for Metro and for those trustees to pay the judgment to the plaintiffs. Adolph appealed the judgment; Metro did not. The court found in favor of defendants Harold L. Ehrhard, Ray W. Schwebel and William A. Ratteree on plaintiffs' claims against them. No appeal was taken by plaintiffs from that portion of the judgment or from the court's refusal to award punitive damages and attorney's fees.

Plaintiffs' suit sought to recover against defendants on the basis of accounts due from Metro for carpet purchased by Metro from plaintiffs. There was no dispute that Metro owed the accounts to plaintiffs. The amounts owed were not disputed and are the amounts reflected in the judgment. Adolph makes no attack on the amount of the judgment. The individual defendants were sued as statutory trustees of Metro. The suit against Adolph was grounded upon two claims, i. e.: (1) that it had received assets from Metro in fraud of plaintiffs' rights as creditors of Metro and (2) that Metro was the "alter ego" or agent of Adolph and Ratteree and that they are liable for the debts of Metro.[1]

Following trial the court entered findings of fact as follows:

### "Findings of Fact"

"1. That at various times during 1974 and 1975, plaintiffs on open accounts sold and delivered goods and merchandise to defendant Metro Distributing Company, a Missouri corporation, whose corporate charter was forfeited on January 1, 1975, as follows:

"Camelot Carpets, Ltd.–$21,578.17 and demand for payment made April 2, 1975;

"Standard Floor Covering, Inc.–$5,975.92 and demand for payment made August 22, 1975;

"Interstate Supply Company–$4,610.10 and demand for payment made July 31, 1975.

"2. That defendant William A. Ratteree as sole owner of defendant Adolph Investment Company had actual or legal control of said Metro Distributing Company during 1974 and 1975; that Adolph Investment Company used Metro Distributing Company and another corporation as its vehicle to purchase and install carpeting in its business of building and operating various apartment houses.

"3. That defendant Ratteree and Adolph Investment Co. caused assets of Metro Distributing Company to be dissipated or wrongfully paid to other creditors thus unintentionally defrauding plaintiffs.

"4. That defendant Adolph Investment Company acting through defendant Ratteree did so without malice and therefore plaintiffs are not entitled to punitive damages.

"5. That said defendant Ratteree represented to plaintiffs that funds of Metro Distributing Company would be available to pay their bills and that plaintiffs relied on the same.

"6. That Metro Distributing Company was not indebted to Adolph Investment Company for any debts that remain unpaid.

"7. That Metro Distributing Company owes plaintiffs the said undisputed amounts.

"8. That attorney's fees are not proper to be awarded to plaintiffs."

On appeal the defendant challenges the judgment on the basis that the evidence failed to establish (1) fraud, (2) fraudulent conveyance of assets, or (3) actual or legal control of Metro by Adolph or Ratteree. We find it unnecessary to rule on the first two contentions as the evidence is sufficient to support the judgment under the "alter ego" or agency theory. Our review is that mandated by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976), and our recitation of the factual background of the judgment is based upon the evidence most favorable to the judgment entered. Some of this evidence was disputed.

Adolph is a company owned 100% by William Ratteree. It is engaged in the development of apartment houses. Prior to 1969 it bought its own carpet for those developments. In 1969, Metro was formed. Ratteree owned six of the 11 shares of that company. The remaining shares were owned by a Mr. Rose. Metro was housed in space previously utilized by Adolph for car-

---

1. This latter charge was added by amendment after trial to conform to the evidence. This was proper. *Solomon v. Moberly Light and Power Co.*, 301 Mo. 622, 262 S.W. 367 (Banc 1924) [1].

pet storage and owned by Adolph. Ratteree's capital contribution to this corporation was carpet inventory worth approximately $40,000.[2] Metro provided carpet and installation service for Adolph in its apartment developments. In September 1973 Rose left Metro and Ehrhard and Schwebel took his place. They purchased the five shares of stock from Metro for $14,250 for which they gave a promissory note. No payments on the note were ever made and the stock was kept in the custody of Ratteree as "Trustee." The purchase agreement had restrictions on sale or transfer of the stock essentially giving Ratteree a right of first refusal. This right of first refusal gave Ratteree the right to purchase the stock or to cause Metro to purchase it. Ehrhard was employed by Metro as its President and General Manager. The employment agreement restricted Ehrhard's commercial activities to Metro and Ayers Floor Company except with the consent of Ratteree and required that any check for more than $500 required the signature of Ratteree. At the same time a service agreement was entered into between Metro, Ayers Floor Company, Adolph, Ratteree and Empire Ltd. (another company controlled by Ratteree) requiring Metro to provide new carpet to Ratteree and his companies at .50 cents a yard over cost. Ayers Floor Company (owned totally by Ehrhard and Schwebel) agreed to lay carpeting for Ratteree and his companies for .80 cents a yard or $1.00 a yard for carpet with rubber backing. The agreement was terminable on 30 days notice, except that so long as Ratteree remained a stockholder of Metro, that company could terminate only with the consent of Ratteree.

Metro borrowed money for operations from Pioneer Bank and Trust Company on an open–ended basis commencing in December 1973. At that time Ratteree and his wife and Ehrhard and his wife executed a personal guaranty of these borrowings. In December of 1973, Ratteree resigned his position "as an officer and/or director of Metro."[3] From September of 1973 on, Ayers, Adolph and another company controlled by Ratteree provided the great majority of Metro's business. Adolph in turn provided a very substantial portion of Ayers' business. It is obvious that Metro was utilized to supply carpet to Ayers and Adolph and that Ayers in turn was utilized to lay the carpet for Adolph. During this period Metro with the knowledge at least of Adolph, began billing much of its carpet to Ayers which in turn billed that charge along with its own to Adolph. Also during this period, and until August 1975, Adolph carried large accounts payable to Metro and Ayers, aggregating at some points in excess of $40,000. Much of these "accounts payable" were not for current purchases and in fact no payments were made to Ayers by Adolph from July 1974 until at least April of 1975. Ayers in turn owed large accounts payable to Metro. The accounts between Metro and Adolph were carried on Adolph's books as "intra–company accounts." In March 1975 Ratteree purported to "surrender" his ownership of Metro stock. It is unnecessary for us to pass upon the legal effect of this purported surrender.

Late in 1974 and through the first half of 1975 plaintiffs began to make inquiry of Metro concerning their overdue accounts. Ehrhard advised them that when he received payment of his accounts receivable from Adolph and Ayers Metro would take care of these accounts. Camelot had advised Ratteree in April, 1975, of the debt owed by Metro and of Ehrhard's advice concerning Metro's accounts receivable from Adolph. In June the representative of Camelot and its attorney met with Ehrhard and Ratteree about that company's account. They were advised by Ehrhard

2. Defendant claimed this inventory was sold to Metro and that Metro still owed $14,000 to Adolph for such inventory at the time of trial. There was evidence indicating that the sale was an afterthought first conceived in 1975 when Metro had reached a state of extremis. There was evidence that the carpet inventory was a capital contribution.

3. The record is not clear but it appears that Ratteree was a director but not an officer of Metro at that time.

that when Adolph paid its accounts to Metro and to Ayers, and Ayers its account to Metro, money would be available to pay the Camelot account. Ratteree indicated it would shortly pay its accounts payable and that money would be available for Metro's creditors. The evidence would also indicate that Ratteree requested that Camelot delay suit on the account in order not to compromise an additional borrowing by Metro from a bank. No suit was then filed.

In August, 1975, Adolph issued two checks. The first was payable to Metro, Ayers and Pioneer Bank. It was endorsed by Ehrhard for Metro and Ayers at Ratteree's request before the amount was filled in. The amount was filled in by Adolph's comptroller for $15,310.26 and was taken to the bank by Ratteree and was applied against Metro's loan from the bank, which had been guaranteed by Ratteree and Ehrhard. The second check was for $13,500 and was made directly payable to Pioneer Bank and was applied against the Metro loan. Adolph then made entries in its books reflecting payment in full of the accounts payable to Ayers and Metro.[4]

In August after Schwebel had refused to sign a new personal guaranty with Ehrhard and Ratteree of the Pioneer Bank loan, Ratteree ordered Ehrhard and Schwebel to leave the Metro premises immediately. They did. The reason given for this by Ratteree was that Metro had failed to pay its rent to Adolph, although Adolph's books reflected that the amount of rent due had regularly been deducted from Adolph's account payable to Metro. Subsequently, Ratteree, purportedly acting in his capacity as landlord, sold certain assets of Metro to satisfy an Internal Revenue Service lien and the remaining assets of $3000 plus to apply against the Pioneer loan.

We have not attempted to set forth the myriad of detail and evidentiary fact which establish the relationship between Ratteree, Metro, Adolph and Ayers. It is safe to say

that Ratteree had and exercised total domination and control over the operations of Adolph and of Metro. It is also safe to say that while he did not have a stock interest in Ayers his control of Metro (Ehrhard's employer and Ayers' supplier) and Adolph (Ayers' predominant customer) Ratteree did have and exercised effective and practical domination and control of Ayers. We note that neither Ayers nor Metro were subsidiary corporations of Adolph in the sense that Adolph owned their stock.

The law in Missouri is well stated in *Lawton–Byrne–Bruner Ins. Agency Co. v. Stiers Bros. Const. Co.*, 186 S.W.2d 480 (Mo. App.1945) as follows:

"Ordinarily two separate corporations are to be regarded as wholly distinct legal entities, even though the stock of the one is owned partly or entirely by the other. Instances occur, however, where one corporation is so controlled and its affairs so conducted as to transform it into the mere adjunct or alter ego of another corporation; and in such a case the question invariably arises, not only as to whether the corporate fiction is to be retained or disregarded in order to reach a correct result, but also as to whether the case is one for equitable relief upon the ground of the inadequacy of any remedy at law. Generally speaking, the test is whether or not the arrangements between the two corporations is being employed for a proper purpose ... If the corporate affiliation is devised or being used to perpetrate fraud or injustice or accomplish some unlawful purpose, equity will interpose to tear down technical legal barriers and pierce through the corporate veil in order to impose liability or grant relief. But on the other hand, if the purpose to be served by the arrangement is fair and lawful, then legal forms and relationships are to be observed and the case determined upon the basis of separate and

---

4. Adolph's records purport to show an additional payment of $981.67 to fully pay the two accounts. Defendant admits this check was issued September 30, to Pioneer Bank. Suit was filed September 3, 1975 by Camelot.

individual corporate existence." l.c. 484–5 [2, 3].

*See also, May Department Stores Co. v. Union Electric*, 341 Mo. 299, 107 S.W.2d 41 (1937); *State ex rel. Shull v. Liberty National Bank of Kansas City*, 331 Mo. 386, 53 S.W.2d 899 (1932); *Smith v. Ford Motor Co.*, 327 S.W.2d 535 (Mo.App.1959); *National Plumbing Supply Co. v. Torretti*, 237 Mo.App. 570, 175 S.W.2d 947 (1943).

The last three cited cases also make it clear that the same rule applies where the corporations involved are owned commonly by the same stockholders but are not in a parent–subsidiary relationship. The precise title to be placed upon the relationship–such as alter ego, agent, adjunct, instrumentality etc.–is unimportant. *May Department Stores Co. v. Union Electric, supra.* Rather the question is whether the corporations are being manipulated through their interrelationship to cause illegality, fraud, or injustice. If they are, the corporate veil will be disregarded to provide relief. *Lawton–Byrne–Bruner Ins. Agency Co. v. Stiers Bros. Const. Co., supra*, [2–3].

Here it is clear that the three corporations, with interlocking ownership, were utilized to create injustice to creditors of Metro. The sole stockholders of Metro and Adolph and the one–half owner of Ayers had personally guaranteed the Pioneer Bank loan to Metro. Adolph by refusing to disburse funds to Ayers and Metro to satisfy its arrearages to those companies prevented those companies, both under–capitalized, from meeting their obligations to the plaintiff creditors. Ratteree, the sole stockholder of Adolph and majority stockholder of Metro, was aware of this and knew that satisfaction of plaintiffs' accounts was dependent on payment from Adolph. When Metro's continued existence became impossible he and Ehrhard caused the accounts payable to Metro and Ayers to be diverted to payment of a loan made to Metro by Pioneer which Ratteree and Ehrhard had personally guaranteed, thereby relieving those individuals of personal liability to the extent of those payments. By any standard this is manipulation.

Defendant asserts that an insolvent corporation may prefer a creditor including an officer or director. That is the law of Missouri. But that "doctrine may be reexamined when the exigencies of the case demand it." *Land Red–E–Mixed Concrete Company v. Cash Whitman*, 425 S.W.2d 919 (Mo.1968) [3, 4]. Here they do. This is not simply a case of preference to a creditor, done in good faith. Rather it involves a continuing course of conduct by Adolph in which it maintained large overdue accounts payable and withheld payment from Metro and Ayers, thereby precluding Metro from satisfying its obligations in the usual course of business. In such a circumstance equity will intervene to prevent injustice and will require that the manipulating corporation satisfy these debts of its insolvent compatriot.

For the same reason we are unimpressed with Adolph's contention that the plaintiffs extended credit on the basis of Metro's solvency. That may be true but it misses the mark. Adolph through manipulation of its accounts payable to Metro and Ayers precluded those companies from meeting their debts in current fashion, resulting in injury to plaintiffs. While plaintiffs may have extended credit to Metro, they certainly could not have anticipated that Metro's primary customer, controlled by Metro's majority stockholder, would so manipulate its accounts as to render Metro unable to meet its obligations.

Judgment affirmed.

SATZ and SIMON, JJ., concur.